No. 72,721

In the Matter of the Marriage of LINDA MONSLOW, *Appellee*, and H. VINCENT MONSLOW, *Appellant*.

(912 P.2d 735)

Opinion filed March 8, 1996.

*Gregory M. Dennis*, of Overland Park, argued the cause, and *J. Charles Droege*, of Overland Park, was on the briefs for appellant.

*David J. Waxse*, of Shook, Hardy & Bacon, P.C., of Overland Park, argued the cause, and *Brett D. Leopold*, of the same firm, was with him on the briefs for appellee.

The opinion of the court was delivered by

ALLEGRUCCI, J.: This is an appeal from the judgment of the district court in a divorce action. Linda and Vincent Monslow were divorced in 1992. Vincent appeals from the district court's order regarding maintenance; property division; child visitation, and numerous other matters. The Court of Appeals affirmed. *In re Marriage of Monslow*, 21 Kan. App. 2d 386, 900 P.2d 249 (1995). Vincent's petition for review was granted on the questions of a maintenance escalator clause and division of patent proceeds.

The facts, for the most part, are set out in the opinion of the Court of Appeals and are not disputed.

At the time of the divorce, Vincent's former law firm had undergone dissolution, and he had begun practice with the Blackwood Langworthy firm. For this reason, "the trial court recognized

the growth potential of Vincent's income." 21 Kan. App. 2d at 389. Based on his earning a $60,000 contingency fee shortly before dissolution of his former firm, the trial court also recognized the potential for temporary, significant increases in his income. For the 11 months preceding trial, his average monthly income was $4,227.

Linda's average monthly income was $2,000. In the year before the divorce, she earned an average of $3,000 per month from the same employer.

The trial court's journal entry states the following with regard to the award of maintenance:

"Respondent shall pay petitioner maintenance of $450/month for a term of 48 months, commencing January 1, 1993. In addition, if respondent's adjusted gross income rises above the $4,227/month average which he experienced for such gross earned income during the first eleven months of 1992, then respondent shall pay petitioner, as and for additional maintenance, 20% of any such increases during the above-described 48-month period. Such additional maintenance, if any, shall be payable quarterly."

The Court of Appeals found that the award was supported by the evidence and concluded that the district court had not abused its discretion in awarding the basic maintenance figure. 21 Kan. App. 2d at 387.

With regard to the escalator clause for additional maintenance, the Court of Appeals concluded that such a clause was permitted by K.S.A. 60-1610(b)(2) as long as the use was reasonable. Finding that the district court's approach was "not an unreasonable approach," the Court of Appeals concluded that the district court had not abused its discretion. 21 Kan. App. 2d at 389. The maintenance escalator clause is the subject of the first question on this review.

The other question centers on the trial court's division of patents held by Vincent. He owns a partnership interest in two patents for a cable television service which would transmit viewer-chosen programs at viewer-requested times. The business plan refers to the concept as "Pic-A-Flick" or "Video On Demand."

Upon examination by Linda's attorney, Vincent gave the following testimony:

"Q. . . . And you agree the patent is incapable of an accurate evaluation at the current time?

"A. . . . That's a loaded question. I mean I think it has tremendous potential and maybe someone could tell you what that potential is. I haven't wasted my money to go out and find that out.

"Q. My question was: In your opinion does [the patent] currently have any value that you can put a number on?

"A. Not that I can put a number on, but it has value I would say.

"Q. *And, therefore, if you can't put a number on it, it has got to be divided in kind; right?*

"A. *What do you mean by 'kind'?*

"Q. *Your wife is going to get a percentage. of it and you are going to get a percentage of it?*

"A. *That would be fine with me.*" (Emphasis added.)

Vincent's affidavit characterized the patents as expectancies without ascertainable value and suggested that they be set aside to Vincent, or, if not, that a small percentage of gross proceeds or 50 percent of the first $3 million be awarded to Linda. Included in his evidence, however, was a plan for developing the patents which forecast a net profit of more than $48 million by the fifth year of market. The district court "awarded the patents to Vincent subject to a lien of 40 percent of the income from the patents, which the trial court vested in Linda. Linda's share of any income from the patents is to be calculated only after deducting necessary expenses." 21 Kan. App. 2d at 390.

We first consider the propriety of including an escalator clause in the maintenance order. The first task for this court is interpretation of K.S.A. 60-1610(b)(2). This is a question of law for which the court's review is unlimited. *Todd v. Kelly,* 251 Kan. 512, 515, 837 P.2d 381 (1992). If acting in conformity with the statute, the district court has wide discretion in adjusting the financial obligations of the parties in a divorce action. Exercise of that discretion will not be disturbed on appeal unless clear abuse of discretion is shown. *In re Marriage of Brown,* 247 Kan. 152, 165, 795 P.2d 375 (1990).

An award of maintenance is governed by K.S.A. 60-1610(b)(2), which states in pertinent part:

"The decree may award to either party an allowance for future support denominated as maintenance, in an amount the court finds to be fair, just and equitable under all of the. circumstances. The decree may make the future payments mod-

ifiable or terminable under circumstances prescribed in the decree. The court may make a modification of maintenance retroactive to a date at least one month after the date that the motion to modify was filed with the court. In any event, the court may not award maintenance for a period of time in excess of 121 months. . . . Maintenance may be in a lump sum, in periodic payments, on a percentage of earnings or on any other basis. At any time, on a hearing with reasonable notice to the party affected, the court may modify the amounts or other conditions for the payment of any portion of the maintenance originally awarded that has not already become due, but no modification shall be made without the consent of the party liable for the maintenance, if it has the effect of increasing or accelerating the liability for the unpaid maintenance beyond what was prescribed in the original decree. Every order requiring payment of maintenance under this section shall require that the maintenance be paid through the clerk of the district court or the court trustee except for good cause shown."

In the Court of Appeals, Vincent argued that the escalator clause, which increases the maintenance amount if his income exceeds the $4,227 monthly average, is not based, as it should be, on Linda's need. He further contended that the effect of the escalator clause was "automatic modification of a maintenance award without the necessary notice and an opportunity for a hearing." 21 Kan. App. 2d at 388.

The Court of Appeals disagreed. It focused on this sentence from the statute: " 'Maintenance may be in a lump sum, in periodic payments, on a percentage of earnings *or on any other basis.*' " 21 Kan. App. 2d at 389. The Court of Appeals stated:

"The term 'any other basis' offers broad support to any *reasonable* formula employed by a trial court in awarding maintenance. It would appear to permit the use of any formula deemed *reasonable* under the circumstances. Accordingly, we hold that the Kansas statute does permit the *reasonable* use of an escalator clause in ordering maintenance." (Emphasis added.) 21 Kan. App. 2d at 389.

The 20 percent of increased income escalator clause formulated by the trial court was considered by the Court of Appeals to be a *reasonable* way of taking into account the potential for growth and for temporary, significant increases in Vincent's income. Thus, the Court of Appeals affirmed that portion of the decree. 21 Kan. App. 2d at 389.

It is not precisely accurate to say, as the Court of Appeals does, that the statute permits reasonable use of an escalator clause in

ordering maintenance. If the statute permits use of an escalator clause, it would be correct to say that an appellate court review involves the inquiry whether use of the clause is reasonable in the circumstances. Although the end result may be the same, the initial inquiry is whether the statute permits the use of an escalator clause in a maintenance award, not whether the statute permits the use of a reasonable escalator clause. It also may be noted that, for Vincent, the end result may be the same because his position is that the statute does not permit use of an escalator clause, but, even if it does, the particular one used in this case is unacceptable, *i.e.*, unreasonable.

Vincent argues in his supplemental brief that the Court of Appeals' construction of the statute is unreasonable in that it fails to harmonize various provisions of the statute. In particular, he argues that the Court of Appeals ignored the statute's prohibiting modification "without the consent of the party liable for the maintenance, if it has the effect of increasing or accelerating the liability for the unpaid maintenance beyond what was prescribed in the original decree." K.S.A. 60-1610(b)(2).

The principle of statutory construction to which Vincent refers is included in the following statement:

"In construing statutes, the legislative intention is to be determined from a general consideration of the entire act. Effect must be given, if possible, to the entire act and every part thereof. To this end, it is the duty of the court, as far as practicable, to reconcile the different provisions so as to make them consistent, harmonious, and sensible. When the provisions of two or more acts affect the same issue and subject matter, the same rule applies." *United Steelworkers of America v. Kansas Comm'n on Civil Rights*, 253 Kan. 327, Syl. ¶ 1, 855 P.2d 905 (1993).

The problem with Vincent's interpretation of K.S.A. 60-1610b(2) is that the escalator clause which would increase his maintenance liability in months when his income exceeded $4,227 is part of the original decree. The escalator clause is a means of adjusting maintenance without modifying the original decree.

*Johnson v. Johnson*, 219 Kan. 190, 547 P.2d 360 (1976), is mentioned in the Court of Appeals' opinion as one of three appellate decisions which its research had revealed in which an escalator

clause was contained in the maintenance award. The other two are *Miller v. Miller,* 209 Kan. 290, 496 P.2d 1343 (1972), and *Beard v. Beard,* 5 Kan. App. 2d 458, 618 P.2d 856, *rev. denied* 229 Kan. 669 (1980). In each case, maintenance is tied to the paying party's adjusted gross income; however, in none is the validity of the self-adjusting mechanism questioned.

Vincent also argues that it is improper for the escalator clause to be tied exclusively to his income. It is his contention that "maintenance is a needs driven concept in Kansas." In other words, he contends that the primary consideration of the trial judge in setting a maintenance amount should be the recipient's needs. In support, he cites *Carlton v. Carlton,* 217 Kan. 681, 538 P.2d 727 (1975), *Martin v. Martin,* 5 Kan. App. 2d 670, 623 P.2d 527, *rev. denied* 229 Kan. 670 (1981), and a journal article which analyzes 1982 amendments to the state's divorce code. These authorities do not support his contention. Instead, they demonstrate a much broader-based approach.

In *Carlton,* the court affirmed the district court's termination of alimony where there was substantial evidence of a change of circumstances. Among the principles recited by the court in its opinion was that the amount of alimony "is to be based upon the needs of one party *and the ability of the other party to pay.*" (Emphasis added.) 217 Kan. 681. In *Martin,* the Court of Appeals cited *Carlton* for the same principle. 5 Kan. App. 2d at 676. In affirming the alimony award, the Court of Appeals considered not only the recipient's needs, but also the terms of the property division, the disparity between the parties' earning abilities, and the wife's "significant contribution to [the husband's] education which led to his increased earning capacity." 5 Kan. App. 2d at 677. The journal article cited by Vincent is Maxwell, *In the Best Interests of the Divided Family: An Analysis of the 1982 Amendments to the Kansas Divorce Code,* 22 Washburn L.J. 177 (1983). Professor Maxwell states:

"The factors for determining the amount of maintenance which are similar to the factors for determining property division are as follows: (a) the age of the parties; (b) the parties' present and prospective earning capacities; (c) the length of the marriage; (d) the property owned by them; (e) the parties' needs; (f) the

time, source and manner of acquisition of property; (g) the family ties and obligation; and (h) the parties' overall financial situation." 22 Washburn L.J. at 227 n.305.

In addition, she notes that fault has not been eliminated from consideration in awarding maintenance. Vincent's notion of maintenance as a "needs-driven concept" is not derived from or supported by the sources he cited to the court.

The Court of Appeals noted that in the states which have considered the issue, there is a split of authority. See Annot., 19 A.L.R.4th 830. "Escalation clause" is defined for the purpose of the annotation as "any provision requiring the adjustment of alimony or child support payments based upon a certain percentage of, or a fixed amount out of, the paying spouse's income and increases in that income, above and beyond a fixed sum of payments." 19 A.L.R.4th at 831 n.2. Escalator clauses relating to maintenance are the subject of § 5 of the annotation. There are only two cases discussed in § 5 of the main volume. One is from New York, the other is from Virginia, and both date from the 1970s. In each, the court invalidated an escalator clause. The 10 cases discussed in § 5 of the September 1995 supplement were decided in the 1980s and 1990. The trend apparent among these more recent cases is to approve escalator clauses relating to maintenance. Among the states in which escalator clauses were approved are Connecticut, Florida, Massachusetts, New York, Pennsylvania, South Carolina, Vermont, and West Virginia. Only two cases are discussed in which escalator clauses were disapproved. One was from Florida, in which disapproval was on grounds peculiar to that case; it does not seem representative of the rule generally applicable by the courts of that state. The other is from New Mexico.

The Court of Appeals declared that, because its decision would be based on the Kansas statute, the decisions from other states would carry little weight. 21 Kan. App. 2d at 388. Although not helpful in interpreting the wording of this state's statute, the decisions from other states may contribute some useful insight into policy considerations. For example, judicial economy and reduction in attorney fees are frequently cited factors where escalator clauses have been sanctioned. In particular, clauses which are tied

to a cost of living index may forestall the parties' reappearance in court to litigate whether the value of the maintenance award has been unduly eroded by inflation. See, *e.g.*, *Chaker v. Chaker*, 155 Vt. 20, 28, 581 A.2d 737 (1990).

An attentive reading of K.S.A. 60-1610(b)(2) in light of the objectives which guided the 1982 amendments to the divorce code leaves the impression that there was no intention to preclude the use of escalator clauses in maintenance awards. In her study of the 1982 amendments, Professor Maxwell states that the update was undertaken in order to make the statutes reflect the actual practice of and national trends in divorce law and to reduce the adversarial nature of the process by discouraging the parties from litigating issues which might be reconciled through negotiation. 22 Washburn L.J. at 177-81. She quotes the Family Law Advisory Committee of the Kansas Judicial Council as follows:

" 'The Committee felt strongly that settlement not only greatly reduces the use of the time of the court, but more importantly leaves the parties with less ill feeling toward one another and a better feeling about the financial disposition of their case.' Recommended Amendments, . . . Proposed Statute § 60-1608, Comment, at 36." 22 Washburn L.J. at 180 n.29.

Professor Maxwell noted that what had been known as "alimony" under the old code became the less stigmatizing "maintenance" in the new code. 22 Washburn L.J. at 227. There was a significant change in the maintenance provision from no limit on duration to a limit of 121 months, with the possibility of reinstatement upon motion of the recipient. L. 1982, ch. 152, § 9. The other obvious change in the maintenance provision was the following: "The decree may make the future payments ~~conditional~~ *modifiable* or terminable under circumstances prescribed ~~therein~~ *in the decree.*" L. 1982, ch. 152, § 9. The change from "conditional," which implies that certain contingencies must be met, to "modifiable" seems to suggest some softening or relaxation of strictures. It fits with the overall objective of making the process more flexible so as to encourage divorcing spouses to resolve issues rather than resorting to adversarial proceedings.

Although "modifiable" could be construed to mean modifiable by court order, the more likely interpretation is that the decree

may include provisions for modifications which would become operative, without court intervention, upon the occurrence of named circumstances. The legislature knew how to express a requirement for court action and did so in regard to reinstatement of maintenance after the expiration of the 121-month period. The legislature plainly stated that the court would have jurisdiction to hear a motion for reinstatement and that "[u]pon motion and hearing, the court may reinstate payments." L. 1982, ch. 152, § 9. Thus, if the legislature had intended future payments of maintenance to be modifiable only upon court order, it could be expected to have said so. It appears that the legislature contemplated modifications in maintenance payments to be triggered by events without court action.

The Court of Appeals held that K.S.A. 60-1610(b)(2) permits the use of an escalator clause. We agree. We further agree with the reasoning of the Court of Appeals in finding that the escalator clause was a reasonable way of dealing with the particular circumstances in this case. The district court did not err in including the escalator clause in the maintenance order or abuse its discretion is setting the percentage at 20 percent of increased income.

Vincent also challenges the propriety of the district court's awarding the interest owned in two patents to Vincent subject to a lien vested in Linda of 40 percent of the income after expenses. Vincent argues that patents are not marital property subject to division. The division of property in divorce actions is controlled by K.S.A. 60-1610(b)(1), which provides:

"The decree shall divide the real and personal property of the parties, whether owned by either spouse prior to marriage, acquired by either spouse in the spouse's own right after marriage or acquired by the spouses' joint efforts, by: (A) a division of the property in kind; (B) awarding the property or part of the property to one of the spouses and requiring the other to pay a just and proper sum; or (C) ordering a sale of the property, under conditions prescribed by the court, and dividing the proceeds of the sale. In making the division of property the court shall consider the age of the parties; the duration of the marriage; the property owned by the parties; their present and future earning capacities; the time, source and manner of acquisition of property; family ties and obligations; the allow; dissipation of assets; and such other factors as the court considers necessary to make a just and reasonable division of property."

That portion of the journal entry which pertains to the district court's division of property states the following with regard to the patents:

"Respondent's interest in United States Patent No. 4,890,320 (dated December 26, 1989), are set aside to respondent, free and clear of all right, title and interest in petitioner. The Court is mindful of the fact that respondent's interest in the patents has been assigned to a certain oral partnership of which respondent is one of several partners. The Court also is mindful of the fact that the above-referenced patents are not yet and may never be income-producing. At such time, if ever, that the patents produce income by way of sale or license, then petitioner shall be entitled to 40% of whatever income respondent earns from same. The '60-40' division between respondent and petitioner, respectively, is in recognition of the fact that respondent presumably will continue to invest his own time in the development, marketing, and/or defense of the patent. Before petitioner shall be entitled to said 40% share of respondent's gross earnings, there shall be deducted therefrom a *pro rata* share of all out-of-pocket expenses incurred by respondent with regard to the development, marketing, and/or defense of said patents after the date of this judgment, together with an appropriate market rate of return to compensate respondent for incurring said expenses on a risk investment basis. Because it is unknown at this time whether or when the patents will be income-producing, the Court orders that that appropriate rate of return will be based on historical data available at the time, if ever, that the patents actually produce income net of expenses. The Court contemplates that, even though certificates of deposit and money market accounts currently earn less than 5% *per annum*, the appropriate rate of return in this instance conceivably could be as much as 20% *per annum*, or even more. No such income earned by the parties with respect to the patents shall be taken into account in determining increased maintenance which might otherwise be owed by respondent to petitioner under paragraph 4 of this Journal Entry."

The district court and the Court of Appeals rejected Vincent's argument that the patents are not property within the meaning of K.S.A. 60-1610(b)(1) and, therefore, cannot be divided by a divorce court. "Marital property" is defined in K.S.A. 23-201(b):

"All property owned by married persons, including the present value of any vested or unvested military retirement pay, whether described in subsection (a) or acquired by either spouse after marriage, and whether held individually or by the spouses in some form of co-ownership, such as joint tenancy or tenancy in common, shall become marital property at the time of commencement by one spouse against the other of an action in which a final decree is entered for divorce, separate maintenance, or annulment. Each spouse has a common ownership in marital property which vests at the time of commencement of such action, the

extent of the vested interest to be determined and finalized by the court, pursuant to K.S.A. 60-1610 and amendments thereto."

In Schedule D of Vincent's domestic relations affidavit, he listed the patents among the assets. Rather than supplying a dollar figure for fair market value and equity of the patents, as he did for all other assets, he used a question mark. For the proposed division of the assets, he stated:

"Because it is unknown whether the patents will generate any proceeds, they are really in the nature of a mere expectancy. Further, because the patents were solely respondent's creation, and conceived before the parties married, respondent believes equitably they should be set aside entirely to him. At most, petitioner should be accorded 6% of any gross proceeds or, in the alternative, 50% of the first $3,000,000 received, if ever, if any."

With regard to Vincent's affidavit and the testimony elicited from him by Linda's attorney, which is quoted earlier in this opinion, the Court of Appeals stated: "It appears to us that in dividing the income from the patents the trial court acted consistent with Vincent's suggestions. This raises a question of invited error." 21 Kan. App. 2d at 390. The Court of Appeals further stated that, even though it could affirm the trial court on the ground that any error in dividing the patents had been invited by Vincent, it chose to examine the merits. Its examination of the merits, however, included repeated references to the role Vincent's evidence played in convincing the trial court to award the property to Vincent and split the income 60/40.

We do not agree with the Court of Appeals that if there was error, Vincent invited it. The affidavit unequivocally and unmistakably states that the patents are assets in the nature of expectancies rather than property and for that reason among other reasons they should not be divided. Only after clearly stating that the patents should be his alone did Vincent make a suggestion as to how the division could be made in the event that the district court concluded, contrary to his contention, that the patents were divisible marital property. A party to a divorce action should not be faulted for avoiding rigid insistence on all or nothing by providing a fallback position. We question the other instances of alleged invited error on which the Court of Appeals relied. In his cross-examination,

Vincent seems to agree with a definition or example given by Linda's attorney of dividing property in kind. Vincent's cross-examination testimony, which is previously quoted in this opinion, is a bit puzzling. Neither it nor the Video on Demand business plan, which are cited by the Court of Appeals as other instances of his inviting error, however, would seem to support that conclusion without consideration of the merits. In particular, the Court of Appeals' view that Vincent's business plan belies his argument that the patents are expectancies without readily ascertainable current value is not correct. A business plan is a formal summary of a *proposed* commercial *venture*, and a business plan customarily is drafted for the purpose of attracting capital investment necessary for starting an enterprise. The net income *projection* of the business plan Vincent introduced is $49 million "by Year 5 of operations." The dollar figure depends not only on the enterprise being commenced and surviving for 5 years, but also on thriving in a highly competitive, regulated industry. At a time when the business has not yet been launched and many contingencies, including "potential acquisition by a strategic partner in the entertainment industry," must be met in order to achieve the projected income, Vincent's characterizing the patents as expectancies without readily ascertainable current value is not necessarily in conflict with his business plan, as characterized by the Court of Appeals.

With regard to Kansas precedents, the Court of Appeals focused on *Grant v. Grant*, 9 Kan. App. 2d 671, 685 P.2d 327, *rev. denied* 236 Kan. 875 (1984). In reaching its holding, the Court of Appeals rejected Vincent's suggestion that *Grant* controls. In that case, the trial court refused to consider the husband's military retirement pay, which he had begun receiving at the time of the divorce, as marital property with a determinable value. Evidence of the current value of the retirement pay had been offered by a life insurance actuary's comparing it to an annuity paying the same monthly amount. He testified that such an annuity would cost $97,600. The Court of Appeals nonetheless concluded that it was proper to consider the retirement pay as income rather than property:

"Here, plaintiff's military retirement pay had no lump sum present value determinable when the divorce was filed. Military retirement pay has none of the

qualities commonly attributable to marital assets such as cash surrender value, loan value, redemption value, lump sum value, or a value realizable after the death of the retiree. *Ellis v. Ellis*, 191 Colo. at 318-19. In these respects, military retirement pay is similar to good will in a professional practice which our Supreme Court concluded in *Powell v. Powell*, 231 Kan. 456, 461-63, 648 P.2d 218 (1982), was not a marital asset subject to division. Military retirement pay is nothing more than a future stream of income which will cease at plaintiff's death. Defendant's comparison of military retirement pay to an annuity is not compelling as annuity value based upon estimated life expectancy provides only a speculative future value. We conclude military retirement pay has no present determinable value which would qualify it as a marital asset subject to division." 9 Kan. App. 2d at 676.

In the present case, the Court of Appeals gave the following explanation why it declined to follow *Grant*:

"This decision was overruled by the legislature in 1987. See K.S.A. 23-201(b); L. 1987, ch. 120, § 1. In *Grant*, we listed 'qualities commonly attributable to marital assets such as cash surrender value, loan value, redemption value, lump sum value, or a value realizable after the death of the retiree.' 9 Kan. App. 2d at 676. In *Grant*, we concluded that a military pension was not property subject to division. We do not consider *Grant* to be in accord with current thinking on the issue and do not feel bound by it." 21 Kan. App. 2d at 391.

Vincent argues that the Court of Appeals' conclusion is too sweeping. The legislature amended K.S.A. 23-201(b) by inserting the phrase "including the present value of any vested or unvested military retirement pay" after "[a]ll property owned by married persons." Thus, Vincent contends, the legislature overruled the specific holding of *Grant* but not the rationale. He would have the court adhere to the principle that marital assets may be identified by attributes "such as cash surrender value, loan value, redemption value, lump sum value, or a value realizable after the death of the retiree." 9 Kan. App. 2d at 676,

The nature of the patents, if not possessing precisely the qualities which are referred to in *Grant* as being commonly attributable to marital assets, is much closer to that standard than is military retirement pay. It follows, therefore, that by amending 23-201(b) to include military retirement pay, the legislature intended to include assets such as the patents among divisible marital assets. In contrast to military retirement pay, which the Court of Appeals character-

ized as "nothing more than a future stream of income which will cease at [the retiree's] death," 9 Kan. App. 2d at 676, the interest in the patents may or may not generate income and would not, by its nature, terminate upon Vincent's death.

Given his position on *Grant*, it appears that Vincent believes that the interest in the patents does not have the qualities listed there as identifying marital assets. This is not self-evident. The business plan, which is built on the patented concept, undoubtedly will be used in an effort to raise capital for the enterprise. Thus, there is a sense in which the patents may be said to have loan value. Another, perhaps more typical, arrangement is for a patent holder to enter into a licensing agreement with a manufacturer/distributor for the use of a patent. Consideration under the licensing agreement might be a lump sum. An initial fee and royalties is another likely form for consideration to take.

Commentators have devoted some thought to the question whether products of an individual's intellectual processes which are protected under federal law may be characterized as marital (or community) property. We learn from 2 Rutkin, Valuation and Distribution of Marital Property § 23.07[1], p. 23-133 (1995), that copyright and patents generally are regarded as property. Pursuant to federal law, the owner of a patent holds a valuable asset—the right to exclusive use of the protected subject matter and the corollary right to prevent others from using it. Thus, "[t]he owner may choose to maintain his monopoly over the subject matter and utilize it for profit, or he may license the use of the protected material for others to exploit. In either case the owner receives profits from his intellectual product." § 23.07[1], p. 23-133.

According to the treatise, "[t]he general treatment of intellectual creations as 'property' suggests that they may be susceptible to characterization as marital (or community) property." § 23.07[1], p. 23-133. Specific guidance on whether patents may be classified as marital property is discussed in the following:

"There are several cases treating patents as community (or marital) property. In *Howes v. Howes* [, 436 So. 2d 689 (La. App. 1983),] and *Marriage of Downes*, [177 Cal. App. 3d 205, 222 Cal. Rptr. 776 (1986),] the Louisiana and California Courts of Appeal summarily concluded that patents earned during marriage were

community property. In an earlier case, *Lorraine v. Lorraine*, [8 Cal. App. 2d 687, 48 P.2d 48 (1935),] a California Court of Appeal also held that patents were property subject to division. *Lorraine* rested its holding on three separate grounds. The patents were applied for after the marriage, which raised the presumption that they were community property. In addition, the *Lorraine* court stressed that the noninvestor spouse had advanced money to be invested in the patent with the understanding that she could have a half interest in the profits. Finally, the court also noted that the inventor spouse in *Lorraine* had commingled the earnings in the patent ventures with community property, and had failed to discharge his burden of tracing the allegedly separate portion, thus requiring that the entire fund be treated as community property.

"In *Dunn v. Dunn*, [802 P.2d 1314 (Utah App. 1990),] the Utah Court of Appeals squarely held that the future royalty income from the husband's invention of surgical instruments used for implanting artificial knees was community property." § 23.07[1], p. 23-134.

In addition to the cases cited in Rutkin, the Court of Appeals mentioned *Hazard v. Hazard*, 833 S.W.2d 911, 916 (Tenn. App. 1991), in which the wife was awarded 20 percent of any future income from sale of a tracheostomy kit produced by the husband during the marriage. Because a patient had died while the kit was being used on him during test marketing, the kit had no marketable value without modification which necessarily would occur, if at all, after dissolution of the marriage. The Tennessee court concluded that, even though a monetary value could not be ascertained, the unperfected kit was in the nature of an intangible asset with intrinsic value and "was properly valued at the time of trial as a contingent asset." 833 S.W.2d at 916.

Setting up a straw man argument that intellectual property is too personal to its creator to be marital property, Rutkin knocks it down:

"[I]ntellectual property, once it has been created, is less inextricably related to its creator than other assets now characterized as marital property, such as pensions and professional goodwill. Unlike pensions and professional goodwill, rights in intellectual property are highly transferable, and title may thereafter be placed in the name of one who did not originally produce them." § 23.07[1], p. 23-135.

In Goldberg, Valuation of Divorce Assets § 12.6, p. 315 (1984), the author groups goodwill with franchises, licenses, patents, trademarks, and trade names as "intangible property which has no intrinsic or marketable value," but which represents value. In Turner,

Equitable Distribution of Property § 6.22, p. 432 (2d ed. 1994), the author states unqualifiedly that "[g]ood will acquired during the marriage is marital property." He recognizes, though, that there are "[a] few decisions [which] hold that patents and copyrights are not *property* where it is entirely speculative whether any future benefits will be received at all." § 6.23, p. 433. In his view, "they state a very dangerous rule." § 6.23, p. 433.

The "few decisions" to which Turner referred are the two cited by the Court of Appeals. 21 Kan. App. 2d at 392. Each presents a different rationale for holding that patents are not property. *Woodward v. Woodward*, 294 S.C. 210, 216, 363 S.E.2d 413 (Ct. App. 1987), features an unusual determinant—a "policy of finality desired in marital litigation." On that basis, the South Carolina Court of Appeals volunteered, it would have affirmed the trial court's refusal to award the husband an interest in the wife's patent. Because he did not complain of it in the trial court, however, award of the wife's patent entirely to her was not an issue which could be considered on appeal. 294 S.C. at 216. Vincent cites *In re Marriage of Sadecki*, 250 Kan. 5, 825 P.2d 108 (1992), for the proposition that Kansas courts also embrace the "policy of finality." In *Sadecki*, the wife complained on appeal that the trial court erred in awarding the husband's baseball retirement benefits entirely to him in order to accomplish a clean break. She argued specifically that the trial court was more enthusiastic about accomplishing a clean break than an equal split of assets. This court first reminded her that K.S.A. 60-1610(b)(1) does not require a 50/50 split. Then the court stated:

"[I]t is not only within the trial court's discretion, but perhaps within the court's wisdom, to choose not to divide ongoing sources of income. As a general rule, the goal of the divorce court is to divide property in such a way as to avoid ongoing financial interaction between the parties. See, *e.g., Simmons v. Simmons*, 87 Ill. App. 3d 651, 656, 409 N.E.2d 321 (1980). It is not unreasonable for a court to attempt to disentangle the parties' economic partnership so as to achieve a conclusion and finality to their marriage, and in most cases such a goal is to be commended. See *Hoyt v. Hoyt*, 53 Ohio St. 3d 177, 182-83, 559 N.E.2d 1292 (1990) (regarding distribution of retirement benefits)." 250 Kan. at 13.

This court concluded that, when considered within the context of the overall division of property and on the record before it (which

lacked any evidence of present value), the trial court's assignment of the undivided baseball retirement benefits to the husband was not an abuse of its discretion.

In *Yannas v. Frondistou-Yannas*, 395 Mass. 704, 481 N.E.2d 1153 (1985), the principal issue to be resolved was custody of the children, which was complicated by the husband's professional fortunes being greater in this country and his wife's being greater in Greece. Almost as an afterthought, the Massachusetts court took up consideration of the division of the marital assets and affirmed the trial court. The conclusion was that the judge

"was warranted in declaring uncertain the value of the husband's patents on artificial skin. The judge could have concluded on the evidence that the present value of the husband's future income from this source was too speculative to consider. The asset was not one which obviously has current value but is difficult to appraise (such as a close corporation)." 395 Mass. at 714.

Here is Turner's suggestion as to how this issue should have been handled:

"If the court holds that a patent is not *property* and future royalties actually are received, the nonowning spouse has received no share of an asset which is unquestionably a product of the marital partnership. Thus, if there is any possibility that future benefits will be received, a patent or copyright should be treated as *property*. To the extent that future benefits might not materialize, the remedy should be to divide the future benefits if, as, and when they become payable, and not to hold that the entire patent or copyright is not divisible. This is the same method of division which is frequently used to divide unvested pensions." § 6.23, p. 433.

In the present case, the trial court's assigning the patents to Vincent and a percentage of any future revenue from them to Linda fits the paradigm.

Vincent has contended all along that the interest in the patents was not subject to division because it had no current value. He argued that any method of division recognized in this state's courts is based on a current value.

There would not seem to be, however, an insurmountable obstacle to achieving equitable distribution of property without ascertaining a current dollar value. The trial court may formulate an

award based on percentages and base the percentages on allocations between individual and marital interests. Turner suggests:

"None of the reported cases considers when patents and copyrights are *acquired* for equitable distribution purposes. Logically, however, intellectual property interests should be *acquired* when the owning spouse expends the necessary effort and not when they are actually received. Thus, a copyright received shortly after the marriage begins should be separate property if the owning spouse performed the necessary work before the marriage. Similarly, if a spouse expends all of the necessary effort during the marriage, but actually receives the patent a week after the date of classification, the patent should be marital property. Where the work is done partly before and partly after the marriage, a patent or copyright would logically have both marital and separate interests. These rules are analogous to the principles used in most states to divide retirement benefits, as well as to the *source of funds rule* used in many states to classify mixed marital and separate property." § 6.23, pp. 433-34.

The trial court's formulation in the present case awarded the property to Vincent and a percentage of any revenue to Linda as a way of accommodating the lack of a current dollar value for the patents. The Court of Appeals concluded that there was nothing in Kansas law which was violated by the trial court's treating the interest in the patents as marital assets subject to division despite the absence of a current dollar value. The Court of Appeals concluded that the interest in the patents was "clearly included" in the directive of K.S.A. 60-1610(b)(1) "to divide the 'real and personal property of the parties.'" 21 Kan. App. 2d at 392. We agree.

The Court of Appeals found additional support for treating the interest as divisible and as property. The invention's actually being accorded federal patent protection during the marriage was a factor in favor of divisibility. 21 Kan. App. 2d at 391.

"In addition, under federal law, patents have the attributes of personal property. 35 U.S.C. § 261 (1988). 'While a patent is not a conveyance of property from the government, it is a species of property—incorporeal, personal property which has no local situs in itself, but whose situs follows the person of its owner.' 60 Am. Jur. 2d, Patents § 7, pp. 44-45." 21 Kan. App. 2d at 391.

In the present case, the trial court awarded the property—the ownership interest in the patents—to Vincent and subjected future income generated by the interest to a 40 percent lien in favor of Linda. The trial court rationalized the unequal division as recog-

nition that Vincent "presumably will continue to invest his own time in the development, marketing, and/or defense of the patent." It might also be argued that Vincent's partially creating the concept before their marriage, his completing the work and actually securing the patents during the marriage, as well as his anticipated future efforts toward maturation and marketing of the concept are factors supporting an unequal split.

Turner recommends *In re Heinze*, 257 Ill. App. 3d 782, 631 N.E.2d 728 (1994), as an "extremely well-reasoned opinion holding that future book royalties are marital property." § 6.23 (1995 Supp.), p. 89. He also refers extensively to the method of division employed in that case:

"The work needed to produce royalties from intellectual property need not all be performed before the property interest itself is created. In [*Heinze*], the wife wrote several books during the marriage. To assist in sales of those books, however, the wife traveled across the country speaking at seminars and undertaking other efforts to promote sales. The court awarded the husband only 25 per cent of the future royalties, reasoning that a significant portion of the royalties would be the product of the wife's postdivorce promotional efforts. The *Heinze* court also held that only the net post-tax royalties were subject to division." § 6.23 (1995 Supp.), pp. 89-90.

In this vein, Vincent argues:

"No reasonable person would determine that the Court's Order allowing [Linda] a 40% share of the income from the patent is reasonable in light of the fact that [he] must invest his own money and efforts for an indefinite time into the future in order to convert the patent to something of value—something that produces income."

He adds:

"Despite the fact the life of the patent is 17 years, it is quite conceivable that [he] may invest money and efforts over the life of the patent and even beyond in the case of a patent infringement suit. Accordingly, [he] may not realize any return on his investments in the patent until a time long beyond the expiration of the patent rights, if ever."

Although Vincent's argument may be somewhat exaggerated, he raises a matter of legitimate concern. Because the concept still was in a developmental stage at the time of the decree, the additional investment of time and money which might be required to make

it profitable was unknown. Vincent presented testimony to this effect, and he also offered testimony about informing several prominent corporations of the possibility that they were infringing on his patents. The evidence, however, was no more specific than the summation of the preceding sentences. In this circumstance, it does not appear that Vincent is in a position to complain of the trial court's disposition. As already quoted in this opinion, the trial court expressly accounted for Vincent's ongoing expenditures of time and money in combining award of the property to Vincent with the 60/40 split of income after expenses.

The judgment of the Court of Appeals affirming the district court is affirmed. The judgment of the district court is affirmed.