Richard H. ALSENZ, Appellant,

v.

Marjorie Sue ALSENZ, Appellee.

No. 01–01–00369–CV.

Court of Appeals of Texas,
Houston (1st Dist.).

Feb. 27, 2003.

David B. Black, Vanderpool, for appellant.

Richard Lee Daniels, Bellaire, Sallee S. Smyth, Short & Jenkins, L.L.P., Houston, for appellee.

Panel consists of Justice HEDGES, KEYES, and DUGGAN.[*]

## OPINION

EVELYN V. KEYES, Justice.

We are asked to determine whether the trial court's division of property pursuant to a divorce between appellant, Richard H. Alsenz, and appellee, Marjorie Sue Alsenz, was just and proper. In an issue of first impression, we must decide whether royalty payments received during marriage from inventions patented before the marriage should be classified as community or separate property.

Richard contends: (1) we should abate this appeal and direct the trial court to make findings of facts and conclusions of law; (2) he is entitled to a new trial because Sue did not disclose on her inventory a $39,565 accounts-payable claim; (3) the trial court mischaracterized his separate property as community property; and (4) the trial court abused its discretion in (i) awarding Sue 60% of certain assets, (ii) reimbursing Sue 50% of community funds that Richard lost in stock market day trading, and (iii) reimbursing Sue 50% of community funds spent on Richard's car.

We reverse and remand.

### Factual & Procedural Background

Richard holds a master's degree in physics. He is an inventor who is consid-

[*] The Honorable Lee Duggan, Jr., retired Justice, Court of Appeals, First District of Texas at Houston, participating by assignment.

ered an expert in the field of refrigeration; he has invented and patented more than 35 devices that improve electronic refrigeration. In 1975, Richard founded Altech Controls, Inc. to develop and market his inventions. He is currently the president and majority shareholder of Altech, and has assigned all of his patents to the company. Some of these patents result in marketable products; others do not.

Richard and Sue married in 1996. Shortly after the marriage, Altech hired Sue as a consultant. Sue formed the "MSA" corporation to receive her salary from Altech plus income from items she sold on EBay, an internet auction site. Sue and Richard had no joint bank accounts or joint credit cards; each deposited their income into separate bank accounts.

Neither the marriage nor the business fared well. The record is replete with instances of marital discord. The record also reflects that, by 2000, Altech's sales decreased from $4 million to $1.5 million, its employees decreased from 37 to 12, and the remaining employees took pay cuts.

In addition to drawing a salary from Altech, Richard receives royalties of 4 percent of the gross sales of products developed from his inventions. During his marriage to Sue, Richard received $706,730.56 in royalties from the sales of devices he invented, patented, and assigned to Altech before the couple married. Richard deposited these royalties into his separate bank account. None of the inventions he developed during his marriage to Sue is currently generating royalties. Whether any of these inventions will generate royalties in the future depends upon several factors, including Altech's financial means to develop a product from the invention and the ability to market it successfully. Sue has not asked for a share of any future royalties from the inventions patented during the marriage.

Richard petitioned for divorce in June 2000. In a pretrial ruling, the court declared Richard's royalty income to be community property. In January 2001, after a 4-day bench trial, the court granted the parties a no-fault divorce decree, granted Sue's request for a protective order, and divided the property unequally. Richard and Sue agreed on a more practical property division, stipulating to a calculation that recognized the nature and value of their respective reimbursement claims, and the trial court incorporated these agreed changes into its final decree.

The trial court did not file requested findings of fact and conclusions of law and denied Richard's motions for new trial and to vacate the decree. While this appeal was pending, Richard and Sue entered into a partial Rule 11 settlement agreement regarding the marital residence. TEX.R. CIV. P. 11. Sue relinquished her interest in the house and promised to execute a special warranty deed in exchange for recovery of her personal property.

■ As a threshold matter, we address Sue's argument that the agreements reached between the parties after the divorce decree was issued act as a bar to Richard's complaints on appeal. She cites no authority to support her contention that the partial agreement operates as a consent judgment. She likewise cites no authority to show that Richard waived his right to complain about certain aspects of the property division because the parties were able to agree about other aspects of the division. We reject these arguments, and turn to Richard's appellate issues.

### Findings of Fact and Conclusions of Law

■ In issue one, Richard argues that the trial court erred in not making re-

quested findings of fact and conclusions of law. He contends that he has been forced to guess at the trial court's basis for its rulings. A trial court's failure to file findings of fact and conclusions of law is presumed reversible, unless the record affirmatively shows that the requesting party was not harmed by their absence. *Tenery v. Tenery*, 932 S.W.2d 29, 30 (Tex.1996). If a party is prevented from presenting his case on appeal, he has been harmed. *Id.*

Although Richard contends that the trial court's rendition and decree are confusing and that he cannot discern what amounts were allowed for the parties' reimbursement claims, the record does not support this contention. The attachments to the decree clearly identify the nature and source of all of the couple's financial assets and debts, their claims for reimbursement, and the proportion of the court's division. Thus, it is possible to follow each asset, claim, and debt from its inception to its ultimate disposition. Moreover, Richard does not appear to have had any problem presenting his case on appeal. Accordingly, we conclude that he has not been harmed by the absence of findings of fact and conclusions of law.

We overrule issue one.

### Royalty Payments

In issue three, Richard contends the trial court erred by characterizing the royalty payments he received on his patents during the marriage as community property instead of separate property, thus divesting him of his separate property. A spouse's separate property consists in part of property owned or claimed by the spouse before marriage. TEX. FAM. CODE ANN. § 3.001(1) (Vernon 1998). Community property consists of property other than separate property that is acquired by either spouse during the marriage. TEX. FAM.CODE ANN. § 3.002 (Vernon 1998).

The characterization of property as either "community" or "separate" is determined by the inception of title to the property. *Barnett v. Barnett*, 67 S.W.3d 107, 111 (Tex.2001); *Smith v. Buss*, 144 S.W.2d 529, 532 (Tex.1940). Inception of title occurs when a party first has the right of claim to the property. *Strong v. Garrett*, 148 Tex. 265, 224 S.W.2d 471 (1949); *Wierzchula v. Wierzchula*, 623 S.W.2d 730, 731 (Tex.Civ.App.-Houston [1st Dist.] 1981, no writ).

No Texas case has addressed when inception of title to patent rights occurs. Arguably, inception may occur at any of three times: (1) when the concept is sufficiently developed to generate a plan to build the invention; (2) when the invention is actually built; or (3) on the effective date of the patent. 2 VALUATION & DISTRIBUTION OF MARITAL PROPERTY § 23.07[2] (Matthew Bender & Co. ed.1997). However, this is not a question that this Court need decide today. All three of these steps occurred *before* Richard's marriage to Sue. Thus, inception of title to Richard's patents clearly occurred before marriage and the inventions are Richard's separate property. TEX. FAM.CODE ANN. § 3.001(1). Rather, we address whether the royalty payments from those inventions received during the marriage should be classified as community or separate property, another issue as yet unresolved by any court.

Property possessed by either spouse on dissolution of marriage is presumed to be community property. TEX. FAM.CODE ANN. § 3.003 (Vernon 1998). To defeat this presumption, a spouse must establish by clear and convincing evidence that property is separate property. *Id.* The record does not reflect whether the royalties paid to Richard during the marriage were kept in a separate account or spent on community expenses. Even assuming Richard could trace these funds, however, we are not

convinced that the royalty payments were separate property.

■ In general, income produced from separate property is considered community property. *Arnold v. Leonard,* 114 Tex. 535, 273 S.W. 799, 803 (1925). This is usually true regardless of the nature of the separate property, whether the separate property generating income is stock or shares in a corporation, a trust, real estate, livestock, or other assets. *See Smith v. Lanier,* 998 S.W.2d 324, 332 (Tex.App.-Austin 1999, pet. denied) (cash dividends on separately held stock are community property); *Ridgell v. Ridgell,* 960 S.W.2d 144, 148 (Tex.App.-Corpus Christi 1997, no pet.) (income from trust is community property); *McElwee v. McElwee,* 911 S.W.2d 182, 188–89 (Tex.App.-Houston [1st Dist.] 1995, writ denied) (rental payments, crops, timber are community property); *Gutierrez v. Gutierrez,* 791 S.W.2d 659, 664–65 (Tex.App.-San Antonio 1990, no writ) (offspring born to cattle during marriage are community property); *Harris v. Harris,* 765 S.W.2d 798, 802 (Tex.App.-Houston [14th Dist.] 1989, writ denied) (profit-sharing distributions are community property). Sue argues that the royalties here are in the nature of such income.

■ An exception to the general rule that income from separate property is community property concerns oil-and-gas royalties. Because such royalties are payment for the extraction of the separate property, the royalties are also considered separate property. *Norris v. Vaughan,* 152 Tex. 491, 260 S.W.2d 676, 679 (1953). Richard argues that the royalties paid on a patent are equivalent to oil-and-gas royalties because the value of a patent diminishes over time. We must decide whether

the income stream generated from intellectual property should be treated under the general rule or in the same manner as oil-and-gas royalties.

Intellectual property is the set of legal rights to an expressed idea—it is property that results from the fruits of mental labor. Richard R. Orsinger & David G. Henry, *Intellectual Property,* NEW FRONTIERS IN MARITAL PROPERTY LAW A1–1(1999). A patent is the grant of a property right from the government to exclude others from making, using, or selling one's invention and includes the right to license others to make, use, or sell it. *Id.* Like other intellectual property, including copyrights and trademarks, the value of a patent stems from the income that can be generated from that right. Like oil and gas royalties, a patent has a finite life. However, like the income generated from separate property, such as land or a trust fund, the body of the patent is never entirely depleted.

The life of each of Richard's pre-marriage patents is 17 years.[1] Although a patent may be renewed, the likelihood is that, after the patents expire, the income stream will greatly diminish because competing products may arise or new technology may supplant Richard's inventions. The patent rights vested in Richard before marriage, and assignment of the patents to Altech does not alter their nature as separate property.

It is unquestionable that, had these patents been taken out during the marriage, the patents and the income they generated would be community property. In this, we would join other jurisdictions in which the courts treat the income from intellectual property created during marriage as marital or community property. *See, e.g., In re*

---

1. Since June 1995, the life of a patent has increased to 20 years. *See* 35 U.S.C.A. § 154(a)(2) (West 2001).

*Monslow*, 259 Kan. 412, 912 P.2d 735, 747 (1996) ("Video on Demand" concept created during marriage is marital property); *accord Rodrigue v. Rodrigue*, 218 F.3d 432, 443 (5th Cir.2000) (wife entitled to half interest in net benefits resulting from copyrighted works created during marriage); *In re Perkel*, 963 S.W.2d 445, 451 (Mo.Ct.App.1998) (computer software written by husband is marital property); *Curtis v. Curtis*, 208 Cal.App.3d 387, 256 Cal. Rptr. 76, 78 (1989) (future residuals from performances during marriage are community property); *In re Worth*, 195 Cal. App.3d 768, 241 Cal.Rptr. 135, 137 (1987) (artistic work created during marriage is community property).

■ Although we recognize that the foregoing cases deal with intellectual property created during marriage, we note that two courts have awarded a spouse an interest in the revenue stream generated by intellectual property the other spouse created before marriage when the spouse contributed to the success of the resulting product. *See Teller v. Teller*, 99 Hawai'i 101, 53 P.3d 240, 254 (2002) (rights to trade secrets vested before marriage but revenue stream awarded to both spouses); *McDougal v. McDougal*, 451 Mich. 80, 545 N.W.2d 357, 358 (1996) (although patents issued before marriage, both spouses awarded income generated from patents). We are persuaded that this is the correct approach to take here, regardless of whether the spouse makes a contribution to the generation of an income stream. We go farther in holding that a spouse is entitled to an interest during marriage in the revenue stream from intellectual property that was created by the other spouse before marriage.

Community property has been defined as "all property and pecuniary rights obtained by, or in the name of, either spouse after the marriage, by toil, talent, thrift, energy, industry, or other productive faculty, and all the rents, issues, profits, fruits, and revenues of separate property." *Logan v. Logan*, 112 S.W.2d 515, 525 (Tex. Civ.App.-Amarillo 1938, no writ). Both "community property" and "revenue" are broad, general terms. "Revenue" has been defined as "[r]eturn or yield, as of land; profit, as that which returns or comes back from an investment; the annual or periodical rents, profits, interest, or issues of any species of property, real or personal; income of individual corporations, government, etc." BLACK'S LAW DICTIONARY 1185 (5th ed.1979). We hold that the income stream generated during the marriage from Richard's inventions patented before the marriage was a "revenue" and a "fruit" of his separate property; therefore, we hold that it was community property. The trial court did not err in so finding.

We overrule issue three.

## Unequal Division of Property

■ In issue four, Richard challenges the award of 60% of the community assets to Sue and 45% of the debts to her. He echoes his complaint about being unable to determine the reasons for the trial court's ruling without findings of fact. As Sue points out, however, the unequal division is supportable by more than one theory based on the facts in the record.

■ Section 7.001 of the Family Code provides: "In a decree of divorce or annulment, the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage." TEX. FAM.CODE ANN. § 7.001 (Vernon 1998). In making a just and right division of the community estate, broad discretion is given to the trial court; this division will not be reversed on appeal unless the complaining party shows that the trial court clearly abused its dis-

cretion. *Murff v. Murff,* 615 S.W.2d 696, 698 (Tex.1981).

■ The test for whether the trial court abused its discretion is whether the court acted arbitrarily or unreasonably. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985). It is the duty of the appellate court to presume that the trial court properly exercised its discretion in dividing the marital estate. *Murff,* 615 S.W.2d at 699. In *Murff,* the Texas Supreme Court set forth factors a trial court may consider in dividing the marital estate. These factors include: (1) the education of the parties; (2) their relative earning capacity; (3) the size of their separate estates; and (4) the nature of the community property. *Id.*

All of these factors favor the award of a greater share of the community assets to Sue. Richard has a master's degree in physics, while Sue's psychology degree was rendered meaningless when her school lost its accreditation. Richard's earnings have historically been higher than Sue's; moreover, his earning capacity is greatly enhanced by his ability to invent new products, from which he can earn royalties in addition to a salary. Richard's separate estate is much larger than Sue's. The bulk of the community estate is in real property, not in liquid assets. Finally, there is evidence in the record indicating that Richard verbally and physically abused Sue. This, too, is a factor favoring the disproportionate award. *See Twyman v. Twyman,* 855 S.W.2d 619, 625 (Tex.1993).

We hold that the trial court did not abuse its discretion in awarding Sue a higher percentage of the community property and a lower percentage of responsibility for the community debts.

We overrule issue four.

### Funds Lost in Day Trading

■ In issue five, Richard challenges the legal and factual sufficiency of the evidence to show that community funds were expended or loaned to Datek (Richard's day trading account) or lost as a result of day trading. Richard further contends that the award was based on an undetermined amount of losses. Thus, he contends the trial court abused its discretion in reimbursing Sue. In her response brief, Sue focuses solely on the source of the Datek funds, *i.e.,* only on whether the funds used in day trading were separate or community funds. The nature of these funds, however, is not the issue before us. Rather, the issue is whether the $35,000 reimbursement was equitable.

■ A party may bring a claim for reimbursement of payments by one marital estate to satisfy unsecured liabilities of another marital estate. TEX. FAM.CODE ANN. § 3.408(b)(1) (Vernon Supp.2002). A trial court resolves claims for reimbursement under equitable principles. *Id.* at § 3.408(c). Permissible reimbursement may run from community estate to separate estate, from separate estate to community estate, and from separate estate to separate estate. *See Dakan v. Dakan,* 125 Tex. 305, 83 S.W.2d 620, 627 (1935). A trial court's discretion in evaluating a claim for reimbursement is as broad as that discretion exercised by a trial court in making a just and proper division of the community estate. *Penick v. Penick,* 783 S.W.2d 194, 198 (Tex.1988).

In reviewing legal insufficiency points, the reviewing court considers only the evidence and inferences, when viewed in their most favorable light, that tend to support the judgment and disregards all evidence and inferences to the contrary. *Davis v. City of San Antonio,* 752 S.W.2d 518, 522 (Tex.1988). If there is more than a scintilla of evidence to support the judgment, the no-evidence challenge fails. *Smith v. Smith,* 836 S.W.2d 688, 691 (Tex.App.-Houston [1st Dist.] 1992, no writ). In

reviewing factual insufficiency points, the reviewing court must examine all of the evidence. *Id.* After considering and weighing all of the evidence, we will set aside the judgment only if the evidence is so weak, or the finding is so against the great weight and preponderance of the evidence, that it is clearly wrong and unjust. *Id.*

Richard testified that he lost some funds in the Datek account but transferred other amounts to satisfy the couple's obligations. Sue testified that Richard used two income tax refunds—one for $20,000 and the other for $24,000—from their joint tax return to fund the Datek account. She also testified that the couple took out a second mortgage for $60,000 that was intended to pay certain obligations but was, instead, lost in day trading. Richard testified that the value of the Datek account at the time of trial was roughly $600. The only income tax return in the record, from 1996, shows a $30,000 short-term capital loss carryover from 1995. The four-year summary of Richard's, Sue's, and MSA's bank accounts reflect total deposits of $38,307, $10,000, and $8,000 respectively into the Datek account.

In sum, the testimony alleges that a total of $104,000 was directed into the Datek account, but the bank records show that a total of $56,307 was deposited into the Datek account. The trial court reimbursed the community $35,000—an amount evidently based on an assumed loss of $70,000. We are unable to reconcile these amounts, and there is not sufficient information in the record that would permit us to reconcile them.

In her pleadings, Sue contended that Richard's separate estate was unjustly enriched by community funds; in her proposed findings of facts and conclusions of law, she sought a finding that Richard had wasted community funds. In so doing, Sue invoked the court's equitable power.

We do not question the propriety of the trial court's decision to reimburse the community for funds lost in day trading. However, given the paucity of the evidence, we hold the trial court abused its discretion in awarding the amount of $35,000 to Sue as reimbursement, because the amount of the day trading losses is neither adequately documented nor discernable on appeal.

We sustain issue five.

### The 1988 BMW Automobile

 In issue six, Richard contends the trial court erred in reimbursing Sue half of the money he spent on his 1988 BMW automobile. Under Texas law, the community estate is entitled to reimbursement for community property funds used to enhance the separate property of one of the spouses. *Anderson v. Gilliland*, 684 S.W.2d 673, 675 (Tex.1985). The amount of reimbursement is measured by the enhanced value to the benefitted estate. *Id.* A trial court has very broad discretion in evaluating a claim for reimbursement. *Penick*, 783 S.W.2d at 198.

 The couple owned two cars. Richard characterizes the 1988 BMW as a "family car" and asks this court to take judicial notice of the principle that ordinary family expenses are not reimbursable. We agree that, generally, there is no right to reimbursement for costs of living. *Norris v. Vaughan*, 152 Tex. 491, 260 S.W.2d 676, 683 (1953). We also note, however, that this car was Richard's separate property and was awarded to him as part of the division of the property.

What troubles us is the lack of evidence in the record concerning the funds expended for the car, regarding both the amount spent and the purpose of the expenditure. Richard testified to $4,000 spent, and Sue testified that $10,500 was spent. There is no invoice or cancelled check in the record to verify the precise amount. Further,

there is no evidence that the funds were expended to "enhance" the value of the car, as opposed to simply repairing or maintaining it. Finally, there is no evidence to show if, or how much, the value of the BMW was enhanced, which is the measure by which we evaluate a claim for reimbursement. *See Anderson,* 684 S.W.2d at 675. In the absence of such evidence, we conclude that the trial court abused its discretion in reimbursing the community estate for funds spent on this car.

We sustain issue six.

### Fraud on the Community

In issue two, Richard contends Sue committed fraud on the community because she did not list a $39,000 accounts payable claim on her inventory. After the divorce, Sue demanded $39,000 in unpaid salaries that she earned working at Altech during the marriage. Although the trial court characterized this dispute as one between the corporations (Altech and MSA), not the parties, we do not agree. MSA was specifically incorporated to receive Sue's Altech salary, a community asset. However, although it is true that Sue did not disclose this (potential) asset on her inventory and did not mention it when asked about MSA's inventory, the record before us does not fully support the contention of fraud. The monies were payable to Sue from Richard's company, and the invoices that were allegedly partially paid were submitted to the company well before the divorce proceedings; thus, Altech and Richard had prior notice of these unpaid monies. The record of the motion for new trial hearing includes remarks from Sue's counsel to the trial court that counsel for both parties discussed these unpaid monies, even though the amounts were not itemized as part of formal discovery. Whether the claim against Altech is valid is an entirely different issue from the issue of whether the money should have been

considered by the trial court when dividing the assets. It is also distinct from the fraud issue. Nevertheless, the $39,000 accounts payable claim is an asset that must be disposed of by the trial court.

Resolution of this issue is not necessary, given our disposition of issues five and six; therefore, we decline to address it further.

We affirm the trial court's ruling that the income from Richard's patents was community property. We reverse those portions of the trial court's decree reimbursing the community estate for expenditures made on the BMW and for day trading losses. We remand the cause for consideration of the fraud claim and a re-division of the marital estate in accordance with this opinion and the parties' previous agreements.