Opinion issued December 31, 2010



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-08-00972-CV

———————————

Tracy Bush,
Appellant

V.

Michael Wayne Bush, Appellee



 



 

On
Appeal from the County Court at Law

Austin
County, Texas



Trial Court Case No. 2006L-4101

 



 

O P I
N I O N

Appellant, Tracy Bush, appeals from a
decree of divorce dissolving the marriage between appellee, Michael Wayne Bush,
and herself and appointing the parties joint managing conservators of their
daughter, C.B.

In six points of error, Tracy argues that the trial court
erred in (1) appointing an amicus attorney in a limited role; (2) awarding the
parents a joint managing conservatorship over their daughter and determining
that Michael should have the right to designate the child’s domicile; (3)
dividing the community estate unequally; and (4) determining that certain
horses were Michael’s separate property.

We affirm.

                                                                                                                                                                
Background

Both Tracy and Michael had children from previous
marriages.  Tracy had a daughter, and
Michael had two sons.  They married in
November 1999 and subsequently had another child, C.B.  

Before their separation, allegations arose that Tracy was
having an affair.  Closer to the time of
the separation, J.S., Tracy’s daughter from her previous marriage, claimed that
Michael had sexually assaulted her. 
Tracy and Michael separated in May 2006, and Tracy filed for divorce in
October 2006.

Agreed temporary orders were entered shortly after the
suit was filed that, among other things, gave Tracy temporary custody of C.B.
and ordered that Michael’s visitations with C.B. had to be supervised by
another adult.  Subsequently, an issue
was raised as to whether Michael’s visitations with C.B. were being properly
supervised.  The trial court decided it
would be best to have an amicus attorney appointed to interview the child and
others, to make this assessment, and “to make sure the child is safe.”  An amicus was appointed and participated in a
limited role in the remainder of the case.

At trial, both parties sought to be appointed the sole
managing conservator of C.B. 
Additionally, the parties could not reach an agreement on the
characterization of the property of the marriage and how it should be divided.  The parties presented testimony and other
evidence regarding the character of various assets and how they should be
divided.  The disputed issues included
how a tax obligation incurred in Michael’s separate property business should be
apportioned and whether certain horses were community property or Michael’s
separate property.

Ultimately, the trial court determined that Tracy had
engaged in an affair during the marriage; that the evidence did not support a
finding that Michael had sexually assaulted J.S.; that the parents should be
appointed as joint managing conservators of C.B.; that Michael should have the
right to designate C.B.’s domicile; that the tax obligation was a community
obligation; and that the horses in question were Michael’s separate
property.  Tracy appealed.

                                                                                                                                         
Appointment of Amicus

In her first point of error, Tracy argues that the trial
court “erred in appointing an amicus attorney in a limited role.”  This issue, however, has not been preserved
for appeal.

On March 1, 2007, an issue was presented to the trial
court as to whether Michael’s visitations with C.B. were being properly
supervised.  The trial court decided it
would be best to have an amicus attorney appointed to interview the child and
others, to make this assessment, and “to make sure the child is safe.”  The parties agreed without any objections
other than questions of whether the parties could afford the amicus attorney.

The amicus attorney interviewed the child, the parents,
Michael’s mother, and a neighbor.  She
also participated in the trial, cross-examining witnesses on topics relevant to
the stated scope of her responsibilities. 
During her closing argument, on May 9, 2008, the amicus attorney
restated her understanding of the scope of her responsibilities.  She stated, “I was brought into this case to
determine whether or not I thought [Michael]’s periods of possession or access
to the child should be supervised.  And
that’s what I’m going to address to the Court.” 
The trial court invited her to express any opinion she had “in regard to
the child, not necessarily limited to just visitation.”  The trial court did not otherwise contradict
the scope of the amicus attorney’s stated scope of responsibilities.  None of the parties contradicted this scope of
responsibilities or objected to its limitations.

Over three months later, in her Response to Motion to Sign
Decree of Divorce, Tracy argued (1) that the proposed decree failed to identify
the limited scope in which the amicus attorney had functioned and (2) that the
amicus attorney:

believed she was appointed with only a limited function
and did not participate in a manner that represented the interest of the child
outside of the specific issues she was assigned to investigate. Petitioner
requests that Jan Allen be recognized and allowed to participate in a more
complete capacity and be allowed to make a recommendation to the court
regarding the best interest of the child.

At the hearing, however, Tracy abandoned her second
argument and only argued that the divorce decree should reflect the fact that
the amicus attorney was appointed with a limited scope of
responsibilities.  Once again the amicus
attorney stated the limited scope of the responsibilities she had
undertaken.  The trial court agreed to
change the language of the decree and no other issue related to the amicus
attorney was raised.

In her motion for new trial, filed on September 25, 2008,
Tracy argued that a new trial should be granted “because the attorney appointed
to represent the interest of the child believed her role in the case was of a
limited nature . . . . [and] limited her function to one issue and did not
participate fully as a representative of the child.”  This argument does not challenge the trial
court’s limitations on the amicus attorney’s scope of responsibilities.  Instead it suggests that the amicus attorney
was incorrect in believing that her responsibilities had been limited in scope.

To present a complaint for appellate review, the record
must show (1) the complaint was presented to the trial court by a timely
request, objection, or motion stating the specific grounds for the desired
ruling if the specific grounds are not apparent from the context and (2) the
trial court ruled on the request.  Tex. R. App. P. 33.1(a); C & K Investments v. Fiesta Group, Inc.,
248 S.W.3d 234, 255 (Tex. App.—Houston [1st Dist.] 2007, no pet.).  Even if we were to take Tracy’s argument in
her motion for new trial as an objection to the trial court’s appointment of
the amicus attorney in a limited scope, this objection came over a year and a
half after the trial court appointed the amicus attorney with those limitations
specifically stated without any objection. 
In that year and a half, the amicus attorney restated her understanding
of the scope of her responsibilities and no objection was ever raised.  Tracy requested, in a response to a motion
filed a month before her motion for new trial, that the amicus attorney’s
responsibilities be expanded, but abandoned that argument in the hearing.  We hold that this issue has not been properly
preserved for appeal.

We overrule Tracy’s first point of error.

                                                                                                                              
Conservatorship of the Child

In her second, third, and fourth points of error, Tracy
attacks certain findings of fact and conclusions of law that resulted in the
trial court determining that Michael and Tracy should be given joint managing
conservatorship of their child with Michael being given the right to designate
the residence of the child.

A.              
Standard of Review & Applicable Law

We review a trial court’s decision on conservatorship for
an abuse of discretion and reverse the trial court only if we determine, from
reviewing the record as a whole, that the trial court abused its
discretion.  Monroe v. Alternatives in
Motion, 234 S.W.3d 56, 64
(Tex. App.—Houston [1st Dist.] 2007, no pet.). 
A trial court abuses its discretion when it acts arbitrarily or
unreasonably, or without reference to any guiding rules or principles.  Id. at 64–65.  We view the evidence in the light most
favorable to the trial court’s decision and indulge every legal presumption in
favor of its judgment.  Holley v.
Holley, 864 S.W.2d 703, 706
(Tex. App.—Houston [1st Dist.] 1993, writ denied).  

Under an abuse of discretion standard, legal and factual
insufficiency are not independent reversible grounds, but are relevant factors
in assessing whether the trial court abused its discretion.  Mai v. Mai, 853 S.W.2d 615, 618 (Tex.
App.—Houston [1st Dist.] 1993, no writ). 
To determine whether
there has been an abuse of discretion because the evidence is legally or
factually insufficient to support the trial court’s decision, we consider (1)
whether the trial court had sufficient evidence upon which to exercise its
discretion and (2) whether it erred in its application of that discretion.  In re T.D.C., 91 S.W.3d 865, 872 (Tex.
App.—Fort Worth 2002, pet. denied).

Under the first prong,
we apply the applicable sufficiency review. 
Id.  In a legal sufficiency
review, we consider all of the evidence in the light most favorable to the
verdict and indulge every reasonable inference that would support it.  City of Keller v. Wilson, 168 S.W.3d
802, 822 (Tex. 2005).  We consider
evidence favorable to the finding if a reasonable factfinder could and
disregard evidence contrary to the finding unless a reasonable factfinder could
not disregard it.  Id. at 827; Brown
v. Brown, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007, no
pet.).  The factfinder is the sole judge
of the credibility of the witnesses and the weight to give their
testimony.  Wilson, 168 S.W.3d at
819.  The final test is “whether the
evidence at trial would enable reasonable and fair-minded people to reach the
verdict under review.”  Id. at
827.

In a factual
sufficiency review, we consider all the evidence for and against the challenged
finding and set it aside only if the evidence is so weak as to make the finding
clearly wrong and manifestly unjust.  Cain
v. Bain, 709 S.W.2d 175, 176 (Tex. 1986). 
“In a bench trial, the trial court is the sole judge of the credibility
of the witnesses, assigns the weight to be given their testimony, may accept or
reject all or any part of their testimony, and resolves any conflicts or
inconsistencies in the testimony.”  Rich
v. Olah, 274 S.W.3d 878, 884 (Tex. App.—Dallas 2008, no pet.). 

Under the second prong,
we consider whether, based on the evidence, the trial court’s decision was
arbitrary, unreasonable, or without reference to guiding rules or
principles.  In re T.D.C., 91
S.W.3d at 872.

In determining conservatorship and possession issues, the
best interest of the child is always the primary consideration.  Tex.
Fam. Code Ann. § 153.002 (Vernon 2008); Lenz v. Lenz, 79 S.W.3d 10, 14 (Tex. 2002).  Furthermore, public policy of this State is
to (1)
assure that children will have frequent and continuing contact with parents who
have shown the ability to act in the best interest of the child, (2) provide a
safe, stable, and nonviolent environment for the child, and (3) encourage
parents to share in the rights and duties of raising their child after the
parents have separated or dissolved their marriage.  Tex.
Fam. Code Ann. § 153.001(a) (Vernon 2008).  The burden of proof in conservatorship cases
is a preponderance of the evidence.  Id. § 105.005 (Vernon 2008); Monroe, 234 S.W.3d at 65.

B.              
Joint Managing Conservatorship

Tracy argues that the trial court erred by appointing both
her and Michael as joint managing conservators. 
Instead, she argued to the trial court that she should be appointed the
sole managing conservator with a supervised possessory conservatorship for
Michael.

In Texas, the trial court is required to presume that the
appointment of the parents as joint managing conservators is in the best
interest of the child until evidence is presented to rebut this
presumption.  Tex. Fam. Code Ann. § 153.131(b) (Vernon 2008).  When, as here, the parents do not file a
written agreed parenting plan, the trial court may render an order appointing
the parents joint managing conservators only if the appointment is in the best
interest of the child.  Tex. Fam. Code Ann. § 153.134(a)
(Vernon Supp. 2010).  The trial court
must consider the following factors:

          (1)
whether the physical, psychological, or emotional needs and development of the
child will benefit from the appointment of joint managing conservators;

          (2)
the ability of the parents to give first priority to the welfare of the child
and reach shared decisions in the child’s best interest;

          (3)
whether each parent can encourage and accept a positive relationship between
the child and the other parent;

          (4)
whether both parents participated in child rearing before the filing of the
suit;

          (5)
the geographical proximity of the parents’ residences;

          (6)
if the child is 12 years of age or older, the child’s preference, if any,
regarding the person to have the exclusive right to designate the primary
residence of the child; and

          (7)
any other relevant factor.

Id.  A finding of a history of family violence
involving at least one of the parents of a child removes the presumption that a
joint managing conservatorship is in the best interest of the child.  Id.
§ 153.131(b).  Family violence
includes sexual abuse by one parent directed against a child.  Tex.
Fam. Code Ann. § 153.004 (Vernon Supp. 2010).

While there was not a finding
of sexual abuse in this case, there was a claim that Michael had abused J.S.,
Tracy’s child from a previous marriage. 
Implicit in Tracy’s point of error is the argument that the trial court
erred by not making this finding.

The allegations of sexual abuse first arose when a pastor
at their church discovered J.S.’s journal that she had accidentally left
behind.  In the journal, J.S. had written
that Michael and one of his sons, T.B., had touched her vaginal area.  The pastor presented the journal to
Tracy.  

Michael was working late that day.  Tracy asked a neighbor to help her talk to
J.S. about what she had written.  The
neighbor agreed.  It is undisputed that
J.S. denied that T.B. had been involved. 
She stated that she only wrote that because she was angry at him at the
time and thought no one would see it.

The neighbor testified that J.S. also recanted that she
believed Michael had been the person. 
Instead, according to the neighbor, J.S. told them that she had been
covered from head to toe on the couch in the living room and did not see who
did it.  The three of them discussed it
and could not figure out who could have done it.  According to the neighbor, three or four days
went by before it was said that Michael did it.

J.S. testified that she was lying on the couch and heard
someone come out of the bathroom, come into the living room, and sit on the
couch.  This person touched her legs and
then her vaginal area.  She opened her
eyes slightly to see who it was and saw that it was Michael.  She took no action until he stopped and left.  Then she ran up to her room and stayed there
until he left.  J.S. testified that she
began cutting herself later as a result of the incident.

A friend of J.S.’s testified that she had spent the night
with J.S. the night the journal was discovered. 
The friend testified that J.S. told her that night that Michael had been
the one to touch her.

Once Michael got home on the night the journal was
discovered, Tracy told him what J.S. had said. 
The next day, Michael called CPS to report the claim.  Michael testified that he was the one who
decided to make the call.  Tracy
testified that she told Michael to call.

Tracy and a friend of hers testified that Michael kept
asking Tracy what his story should be when he talked to CPS.  Michael denied this.

It was over two weeks before CPS investigated the
claim.  In the two weeks after the
journal was discovered, Tracy and J.S. remained at the house.  After two weeks, Tracy left, taking J.S. and
C.B. with her.

At trial, the neighbor also testified that she had a
daughter who had been sexually molested and subsequently began cutting
herself.  Ultimately, her daughter was
sent to a mental health institution for help. 
This incident happened before J.S. wrote about her alleged incident in
her journal.  The neighbor testified that
her daughter and J.S. had been best friends, that J.S. knew about what had
happened to her daughter, and that J.S. saw the attention that her daughter got
when the molestation became known.  The
neighbor testified that she did not believe J.S. was telling the truth.

Delia Conrad, a former CPS employee who had worked on the
case, also testified at trial.  Delia
testified that she thought J.S. was telling the truth because J.S.’s
description of the events was consistent every time J.S. described the events
to her.  Delia testified that, in her
experience, if the description of events remained consistent across time, it
was the truth.

Both parties presented witnesses who testified about
whether they thought J.S. was telling the truth, based on their knowledge of
J.S.

There is testimony in the record that would have allowed
the trial court to determine that the alleged sexual abuse took place.  There is also, however, evidence in the
record that calls into doubt the veracity of the allegations.  Viewing the evidence in the light most
favorable to the trial court’s decision, as we are required to do, the evidence
shows that J.S. accused two men, later recanted as to both, and still later
went back and again accused her stepfather. 
The trial court evaluated her credibility in light of the other events
in J.S.’s life, including her best friend’s situation and her mother’s marital
difficulties.  In these situations,
appellate courts must defer to the determinations of the trial court.  The factfinder is the sole judge of the
credibility of the witnesses and the weight to give their testimony.  Wilson, 168 S.W.3d at 819.  “We may not pass upon the credibility of the
witnesses or substitute our judgment for that of the trier of fact, even if a
different answer could be reached upon review of the evidence.”  Rich, 274 S.W.3d at 884.

We hold that the trial court did not abuse its discretion
in determining that the evidence did not support a finding that Michael
sexually abused J.S.

Tracy also argues in her brief that there was evidence
that Michael had been experiencing significant memory loss as a result an automobile
collision in 2002.  According to Tracy,
these memory problems included forgetting to pick up the children when he had
agreed to do so, leaving their toddler-aged daughter alone by a pool or pond on
two separate incidents, and forgetting where he was going while driving.

Michael strongly disputed these allegations and denied
that these events occurred.  He also was
tested by a psychiatrist for memory problems. 
The resulting report stated that Michael did not show significant signs
of deficiency in memory functions.

The trial court was within its discretion in resolving
this conflicting testimony in favor of Michael and determining that this
evidence did not rebut the presumption that a joint managing conservatorship
was in the best interest of C.B.  We hold
that the trial court did not abuse its discretion in appointing Tracy and
Michael as joint managing conservators of C.B.

C.              
Authorization for Michael to Designate the
Child’s Residence

Tracy challenges the findings given by the trial court as
support for its determination that Michael should have the exclusive right to
designate C.B.’s domicile.  The trial
court found that nine factors contributed to this determination:

          a.       Michael Wayne Bush’s separate property
home is the home the child resided in from birth until [the] date of
separation.

          b.       Michael Wayne Bush has experience in
parenting and has successfully parented two children as the primary custodian.

          c.       Michael Wayne Bush has close family ties
and a good support system, his mother and sister both being actively involved and
willing to assist.

          d.       Michael Wayne Bush was accused of
sexually abusing his 15 year old step-daughter, an allegation that he brought
to the attention of Child Protective Services. The evidence did not support a finding
that Mr. Bush was guilty of the accusations. The evidence further showed that
Tracey [sic] Bush did not believe the allegations at the time they were made
but later used the allegations to support her efforts to obtain primary custody
of her daughter.  Because of this and other
actions taken during the period of separation, the Court believes Tracey [sic]
Bush would never encourage a relationship between Mr. Bush and the child
subject to this suit.

          e.       The evidenced proved that Tracy Bush
committed adultery during the marriage and on numerous occasions allowed her paramour
to stay overnight while the child was present.

          f.       Evidence showed that Tracy Bush has a
quick temper and that she raises her voice and yells at the child while Michael
Wayne Bush is more passive and seems to possess a more even temperament.

          g.       Michael Wayne Bush is more stable than
Tracy Bush. Michael Wayne Bush has resided in his separate property home for over
20 years and continues to reside at the same house. . . . On the
other hand, Tracy Bush prior to the marriage would move repeatedly and since
the parties[’] separation has moved repeatedly. . . .

          h.       Michael Wayne Bush was involved in the
child’s life from the very start.

          i.        The court finds that Mr. Bush is the
parent most likely to encourage involvement by the other parent in the
child[’s] life. The court also finds that there is substantial evidence that
Tracy Bush did and would continue to discourage a relationship between the
child and Michael Wayne Bush.

We address each of these findings separately.

1.                
Michael’s residence was the residence of the
child from birth until separation

This was undisputed by the parties.  We hold that there was sufficient evidence in
the record to support the trial court’s finding that “Michael Wayne Bush’s
separate property home is the home the child resided in from birth until date
of separation.”

2.                
Michael has experience in parenting

Michael was awarded custody of his two sons after his
first divorce.  They were ten and eight
at the time.  Michael was their sole
provider for three years before he married Tracy.  Throughout their lives, Michael took the boys
hunting, fishing, and horse riding.  He
was heavily involved in their extracurricular activities and was given awards
by the Cub Scouts for his involvement. 
Both boys went on to serve in the military after graduating from high
school.

There was some testimony that Tracy pushed the boys to
enter the military because they were “go[ing] downhill.”  This was contradicted by Michael as well as
one of his sons, T.B., who stated that it had been his desire to enter the
military since he was in junior high and that his inspiration to go came from
his older brother and his grandfather.

There was also conflicting testimony about Michael’s
disciplinary practices.  T.B. testified
that Michael would spank them when necessary but preferred to talk to the
children to discuss why they were acting out. 
Michael testified similarly. 
Others testified that Michael was a poor disciplinarian and put
inadequate boundaries on the children’s behavior.

Tracy cites as proof of Michael’s poor parenting the fact
that his other son, K.B., once stole a boat. 
The only testimony about this incident came from Michael.  Michael stated that K.B. “borrowed” the boat
and could have been arrested for it. 
Following this incident, Michael kept K.B. with him at all times so that
he could keep an eye on him in the time remaining before he entered the Navy.

Tracy also argues as proof of Michael’s poor parenting
that T.B. once threatened to leave home. 
This event occurred towards the end of Tracy and Michael’s
marriage.  T.B. told Tracy and Michael
that he was going to move out of the house. 
He testified at trial that the primary reason he wanted to move out was
because of Tracy’s constant yelling. 
Tracy, Michael, and T.B. discussed this for about five hours one
evening.  Ultimately, Tracy and Michael
were able to convince T.B. to stay.

Tracy argues that, during the marriage, she assumed
responsibility for the family cooking, laundry, taking the children to the
doctor, buying clothes for the children, and attending the children’s
extracurricular activities.  While most
of this evidence is not in dispute, it does not resolve whether Michael had
experience in parenting.  Tracy’s good
acts a mother do not disprove Michael’s experience in parenting.

We hold that there was sufficient evidence in the record
to support the trial court’s finding that “Michael Wayne Bush has experience in
parenting and has successfully parented two children as the primary custodian.”

3.                
Michael has close family ties and a good support
system

Shortly after the suit for divorce was filed, the trial
court entered temporary orders that were agreed to by the parties.  Included in those orders was the requirement
that Tracy would have temporary custody of C.B. and that Michael would be
required to be always in the presence of a supervising adult during his
visitations with her.  The testimony at
trial established that Michael’s mother was the primary supervising adult
during these visitations.  The testimony
at trial also established that this required significant effort on the part of
Michael’s mother since she lived a significant distance from Michael.  Michael testified that he was close to his
mother as well as to his three living siblings.

Michael’s sister, Susan, testified that she would act as
supervising adult during the visitations when her mother could not do it.  She testified that it was difficult for her
schedule but that she did it because she cared for Michael.

None of this evidence was contradicted.  We hold that there was sufficient evidence in
the record to support the trial court’s finding that “Michael Wayne Bush has
close family ties and a good support system, his mother and sister both being
actively involved and willing to assist.”

4.                
Tracy committed adultery

During the marriage, Tracy obtained a job with what is now
BA Systems.  Eugene was her supervisor.  It is undisputed by the parties that, some
time after Tracy began work, rumors began about Tracy and Eugene having an
affair.  Tracy discussed this with
Michael early on and told him not to believe the rumors.  Michael testified that he trusted her that
they were lies.  On at least one
occasion, Eugene came over to discuss the rumors with Michael, also stating
that they were lies.  The rumors
persisted.

Michael testified that he would come home sometimes and
find Eugene at the house with Tracy.  T.B.
testified that he came home once and found Eugene by their pool with Tracy
cleaning the pool in a bikini.

Michael received multiple calls from Eugene’s wife, who
also insisted that Tracy and Eugene were having an affair.  On one occasion after Michael and Tracy were
separated, Eugene’s wife called and the two compared times that both of their
spouses were away from their respective homes. 
One of the instances included the night before this telephone
conversation when Tracy was at Michael’s house and then left to pick J.S. up
from an event.  The event was over at
midnight, but Tracy left at 10:00 P.M. to pick up J.S.  Michael later questioned Tracy about it, and
she said she had just driven to the location early and had sat in the parking
lot for two hours.  Michael then called
Eugene to question him about it. 
According to Michael, Eugene admitted to the affair.  Michael stated that Tracy then admitted to
being with Eugene but denied that anything inappropriate had happened.  Michael stated that the next day Tracy told
him she wanted a divorce.

Tracy testified that she had a sexual relationship with
Eugene after her separation from Michael but never before.  Eugene’s testimony was the same.  Tracy testified that Eugene stayed over at
her new place on two or three nights when C.B. was also there.  She testified, however, that this was before
their sexual relationship began and that they slept in separate rooms on those
nights.

Adultery, as used in a divorce proceeding, means the
voluntary sexual intercourse of a married person with one not the husband or
wife of the offender.  Bell v. Bell, 540 S.W.2d 432, 435 (Tex.
Civ. App.—Houston [1st Dist.] 1976, no writ). 
A finding of adultery is not limited to acts committed before the
separation of the parties.  Id.  We hold that there was sufficient evidence in
the record to support the trial court’s finding that “[t]he evidence proved
that Tracy Bush committed adultery during the marriage and on numerous
occasions allowed her paramour to stay overnight while the child was present.”

5.                
Tracy has a quick temper and raises her voice
and yells at the child

Michael testified that Tracy yelled and screamed
frequently at the children.  He further
testified that, throughout the marriage, Tracy took medicine for mood swings
and that she yelled and screamed a lot when she was not on her medication.  T.B. testified that Tracy yelled and screamed
a lot and that was the primary reason he had wanted to move out of the house.  He testified that they rarely made it through
a dinner without someone getting yelled at. 
He also testified that Tracy took medication that she referred to as her
“happy pills” that would help calm her down. 
The Bushes’ neighbor testified that she saw Tracy scream and yell a lot
and that she believed Tracy needed help calming down.

Tracy denied that she was on medication during the
marriage or that she screamed and yelled a lot. 
She did testify that, after she was separated from Michael, C.B.
observed that she hadn’t yelled at them in a long time.

The uncontradicted evidence established that Michael
rarely yelled at the children.  T.B.
testified that Michael preferred to talk it over with the children when they
misbehaved.

We hold that there was sufficient evidence in the record
to support the trial court’s finding that “[e]vidence showed that Tracy Bush
has a quick temper and that she raises her voice and yells at the child while
Michael Wayne Bush is more passive and seems to possess a more even temperament.”

6.                
Michael has lived in the same home for more than
20 years while Tracy has moved numerous times before and after the marriage.

It was also uncontradicted that Michael had lived in the
same home for more than 20 years while Tracy had moved numerous times before
and after the marriage.  All of the
relevant testimony established that Michael had lived in the same residence for
over 20 years.  Tracy testified that she
moved eight times after her first divorce and before marrying Michael.  She testified that she had moved three times
in the year and a half following her separation from Michael.  J.S. testified that she had been “raised to
just up and move whenever [Tracy] said let’s go.”

We hold that there was sufficient evidence in the record
to support the trial court’s finding that Michael had more stable living conditions
than Tracy.

7.                
Michael was involved in the child’s life from
the start

While there was not a lot of testimony regarding Michael’s
involvement with C.B. individually, there was much testimony establishing
Michael’s involvement with the children generally.  He attended extracurricular events and was
otherwise active in his children’s lives. 
After the separation, Michael made sure to have a supervising adult
present during his visitation periods so that he could spend time with
C.B.  He also made efforts to attend
C.B.’s extracurricular events outside of his visitation periods.

Tracy testified that Michael “lacked in the father nature
other than he does come home and hug her.” 
She also testified that on weekends he would maybe swim with her for
half a day, but “that was about the extent of it.”

We hold that there was sufficient evidence in the record
to support the trial court’s finding that “Michael Wayne Bush was involved in
the child’s life from the very start.”

8.                
Michael is more likely to encourage Tracy’s
involvement in the child’s life than Tracy would encourage Michael’s
involvement

During their separation before the entry of the divorce
decree, Tracy had primary possession of C.B. 
Michael testified that Tracy frequently scheduled events for C.B. to
attend during Michael’s visitation periods and would talk about them with C.B.
to get her excited about them.  Michael
testified that he would go to the events to keep C.B. happy but got tired of
the constant filling of his visitation time without his input.  Michael also testified that, during his
visitation periods, Tracy would call repeatedly throughout each day to talk to
C.B.  Michael’s sister testified that
this happened repeatedly during the visitations that she supervised.

As a part of the agreed temporary orders entered shortly
after the divorce proceedings were initiated, Eugene—who was a third-party
defendant in the suit at the time—was enjoined from coming within 200 feet of
Michael or C.B.  He was also enjoined
from being in the presence of C.B.  After
these orders were entered, C.B. and T.S. were scheduled to be in a dance
recital.  Tracy knew that Michael would
attend the recital.  When Michael
arrived, he saw that Eugene was seated in the auditorium.  

Testimony at trial established that the auditorium was not
larger than 200 feet across.  It was
undisputed that Eugene did not have a child performing in the recital.

Michael approached and told Eugene that he needed to
leave.  Eugene refused.  According to Michael, Tracy came out from the
back and yelled at Michael for trying to make Eugene leave.  Michael ultimately sat in another portion of
the auditorium and was able to see C.B. perform during the first half.  

During the intermission, Michael called the sheriff’s
office.  A deputy came out but ultimately
told Michael that he could not make Eugene leave.  Michael decided to leave to avoid a
conflict.  

Tracy denied inviting Eugene or even knowing he would be
there.  Eugene testified that J.S. had
invited him.  When she did learn that
Eugene and Michael were both there, Tracy did not ask Eugene to leave.

There is no evidence that Michael made any attempts to
interfere with Tracy’s relationship with C.B.

We hold that there was sufficient evidence in the record
to support the trial court’s finding that “Mr. Bush is the parent most likely to
encourage involvement by the other parent in the child[’s] life. . . .
[and that] Tracy Bush did and would continue to discourage a relationship
between the child and Michael Wayne Bush.”

9.                
The evidence did not support a finding that
Michael was guilty of the accusations of sexual abuse, Tracy did not initially
believe the allegations, and Tracy would not encourage a relationship between
Michael and C.B.

The trial court’s fourth iterated finding actually consists
of three findings: (1) that the evidence did not support a finding that Michael
was guilty of the accusations of sexual abuse, (2) that Tracy “did not believe
the allegations at the time they were made but later used the allegations to
support her efforts to obtain primary custody of her daughter,” and (3) that
Tracy would not encourage a relationship between Michael and C.B.  We have already addressed the first and third
findings.  We turn, then, to the second
finding.

Michael testified at trial that, when the accusations came
out, Tracy “knew it wasn’t true,” but did not explain how he knew this.  Tracy testified that she was conflicted about
the accusations and wanted to believe that her husband was innocent, but now does
not.  Tracy waited two weeks after J.S.’s
accusation before moving out with J.S. and C.B. 
Tracy testified at trial that she waited two weeks because she had
difficulty finding a place to stay and that she kept asking Michael to move out
during this time.  No evidence was
introduced to contradict Tracy’s statement that she was unable to find another
place to stay during those two weeks. 
The testimony also established that Michael, Tracy, and J.S. made sure
that Michael was not alone in the same room with J.S. during this period.  

We do not need to determine whether the evidence was
sufficient to support this finding, because, even if we did make such a
determination, there is sufficient evidence in the record to support the rest
of the trial court’s findings.  We hold
that the trial court’s findings support the determination that Michael should
be the joint managing conservator with the exclusive right to designate C.B.’s
domicile.

We overrule Tracy’s second, third, and fourth points of
error.

                                                                                                                     
Division of the Community Estate

In her fifth point of error, Tracy argues that the trial
court abused its discretion in dividing the community estate.  Specifically, she argues that the trial court
erred by (1) considering a tax liability incurred by Michael’s separate
property business in its division of the community estate; (2) ordering an
unequal division of the community property; and (3) insufficiently reimbursing
the community estate for funds expended in improving Michael’s separate
property home.

A.              
Standard of Review & Applicable Law

Pursuant to the Texas
Family Code, “the trial court shall order a division of the estate of the
parties in a manner that the court deems just and right, having due regard for
the rights of each party and any children of the marriage.”  Tex. Fam.
Code Ann. § 7.001 (Vernon 2006); Alsenz v. Alsenz,
101 S.W.3d 648, 654 (Tex. App.—Houston [1st Dist.] 2003, pet. denied).  The trial court has broad discretion in
dividing the marital property and its division will not be disturbed on appeal
unless the complaining party shows that the trial court clearly abused its
discretion.  Alsenz, 101 S.W.3d at
654–55 (citing Murff v. Murff, 615 S.W.2d 696, 698 (Tex. 1981)).  

The abuse of discretion standard of review for division of
the community estate is the same as the abuse of discretion standard we have
cited above for determining conservatorship of a child.

 The trial court has
wide discretion in dividing the community estate, but it must confine itself to
the community property.   Jacobs v.
Jacobs, 687 S.W.2d 731, 733 (Tex. 1985). 
When the court of appeals concludes that the trial court has
mischaracterized property and thus abused its discretion in dividing the
community estate, the reviewing court may not substitute its discretion for
that of the trial court but must remand for a “just and right” division of the
community estate, a matter lying solely within the discretion of the trial
court.  Id. at 732.   Thus, if we
find reversible error that materially affects the trial court’s property
division, we must remand the cause for a new division of the community
estate.  Id. at 732–33.

B.              
Michael’s Business’s Tax Liability

In her fifth point of error, Tracy argues that the trial
court abused its discretion and acted arbitrarily and unreasonably in dividing
the community estate.  Tracy argues that
unpaid payroll taxes incurred by Michael’s business, Prescom Equipment, are a
debt incurred by Michael’s separate property and that the trial court erred by
considering the tax obligations in its division of the community estate.  Specifically, Tracy argues that Michael took
out a loan in the amount of $47,000, secured by land owned by the community
estate in Crockett, Texas, in order to pay payroll tax obligations of his sole proprietorship,
Prescom Equipment, and that the trial
court erred in finding that the lien was a community liability and subtracting
the $47,000 lien from the $78,000 fair market value of the land, and in thus
finding that the land owned by the parties had a value of $31,000.

Prescom Equipment is Michael’s sole proprietorship.  Through Prescom Equipment, Michael repairs
compressors, generators, and pressure washers for businesses.  It is undisputed that Prescom Equipment is
Michael’s separate property.  It is also
undisputed that during the marriage Tracy participated in the business as an
office manager and that the parties lived on the income from Prescom Equipment
and filed joint federal income tax returns. 
Prescom Equipment also filed federal employment tax returns, and the
unpaid employment tax obligations, along with the resulting penalties and
interest that accrued, arose during the marriage.  For many months from 2002 to 2006, Prescom
Equipment failed to file certain forms relating to employment taxes with the
IRS and failed to pay the taxes for those same months.  At some point in 2006, the IRS initiated an
investigation regarding the missing forms and taxes.  During this investigation, it was determined
that at least $50,000 was owed by Prescom Equipment in taxes, penalties, and
interest.

During the pendency of the divorce proceedings, the IRS
threatened to force the sale of certain community property if Michael did not
pay what was owed in employment taxes. 
The trial court ordered Michael to take out a loan against that property
in order to pay what was owed to the IRS and ordered Tracy to sign the
necessary documents to effectuate that loan. 
For reasons that do not affect our analysis of this issue, Tracy did not
sign any loan documents.  Michael eventually
obtained a loan in the amount of $47,000 against the property in his name only,
and the money owed to the IRS was paid.[1]  Ultimately, the trial court determined that
the $47,000 debt was a “liabilit[y] of the community estate [and was] considered
by the Court in determining a just and right division.”

In their briefs, both parties focus on whether Tracy could
or should have been personally liable for the employment tax obligation to
establish whether the payroll tax obligation should have been considered in the
division of the community estate.  Tracy
cites to section 3.201 of the Family Code in support of her argument that she
could not be held liable for the debt and, accordingly, the debt could not be
considered in dividing the community estate. 
See Tex. Fam. Code Ann. § 3.201 (Vernon 2006).  Section 3.201 provides that a person is
liable for acts of a spouse if the spouse acted as an agent for that person or
incurred debt for necessaries and that “[e]xcept as provided by this
subchapter, community property is not subject to a liability that arises from
an act of a spouse.”  Id. at § 3.201(a)(1), (b).  Michael argues that, because Tracy
participated in the management of the business, the trial court was correct to
determine that the tax obligation was a community liability.  

Both Tracy’s and Michael’s arguments address the manner of
determining liability of spouses to third-party creditors instead of the manner
of determining whether certain debts and liabilities of the spouses are
liabilities of the community and can therefore be considered in dividing the
community estate.  When a third-party
creditor attempts to collect on a debt, liability to the creditor is not
assessed against the community estate or the separate estates of the
spouses.  Instead, it is assessed against
one or both of the parties to the marriage in their individual capacity.  See
Nelson v. Citizens Bank and Trust Co. of Baytown, Tex., 881 S.W.2d 128, 131
(Tex. App.—Houston [1st Dist.] 1994, no writ) (holding contractual liability of
one spouse allows creditor to reach that spouse’s share of community property
but does not make other spouse personally liable).  Section 3.201 addresses when the acts of one
spouse attach to the other spouse for purposes of liability to a third-party
creditor.  Tex. Fam. Code Ann. § 3.201.  Section 3.202 addresses what portions of the
assets of the spouses can be reached by a third-party creditor after liability
has been assessed against one or both of the spouses.  Tex.
Fam. Code Ann. § 3.202 (Vernon Supp. 2010).  Neither of these statutes addresses what debt
can be considered as a debt of the community in creating a just and right
division of the community estate.

During the trial, the trial court stated to the parties,
“[W]hether [Tracy] was liable for [the taxes] . . . is not going to
change the character of whether it was or was not a community debt.  Whether they’re going to look to her
individually once this is all said and done, doesn’t transform it from
community to a separate debt.”  We agree
with the trial court.  Whether a spouse
is liable to a third-party creditor for the debt of the other spouse is a
separate analysis from determining whether certain debts and liabilities of the
spouses can be considered in dividing the community estate.[2]  See
Inwood Nat’l Bank of Dallas v. Hoppe, 596 S.W.2d 183, 185 (Tex. Civ.
App.—Texarkana 1980, writ ref’d n.r.e.) (holding characterization and division
of property in divorce have no effect on third-party creditor’s rights); Providian Nat’l Bank v. Ebarb, 180
S.W.3d 898, 902 (Tex. App.—Beaumont 2005, no pet.) (holding determining debt to
be community liability does not affect whether one spouse is liable to creditor
for debt incurred by other spouse).

A sole proprietorship does not have a separate legal
existence distinct from the operator of the business.  Ideal
Lease Serv., Inc. v. Amoco Prod. Co., Inc., 662 S.W.2d 951, 952 (Tex.
1983).  The assets and liabilities of the
sole proprietorship belong to the operator directly.  CU
Lloyd’s of Tex. v. Hatfield, 126 S.W.3d 679, 684 (Tex. App.—Houston [14th
Dist.] 2004, pet. denied) (citing Black’s
Law Dictionary 1398 (7th ed. 1999)). 
Accordingly, the employment-tax obligation belongs to Michael Bush
directly, regardless of whether the obligation is characterized as a liability
of the community or not.  The parties do
not dispute that Prescom Equipment itself is Michael’s separate property.  It remains for us to determine, then, whether
the loan taken out by Michael to pay off the tax obligation incurred during the
marriage is an obligation to pay off a debt of the community and therefore
could properly be considered in dividing the community estate.

Community property is defined as “all property and
pecuniary rights obtained by, or in the name of, either spouse after the
marriage, by toil, talent, thrift, energy, industry, or other productive
faculty, and all the rents, issues, profits, fruits, and revenues of separate
property.”  Alsenz, 101 S.W.3d at 654 (quoting Logan v. Logan, 112 S.W.2d 515, 525 (Tex. Civ. App.—Amarillo 1938,
no writ)).  Profits gained from separate
property are community property.  McElwee v. McElwee, 911 S.W.2d 182,
188–89 (Tex. App.—Houston [1st Dist.] 1995, writ denied).  Debts and liabilities incurred jointly by the
spouses, such as federal income tax liabilities, must be considered by the
trial court in determining a just and right division of the community estate
and must be apportioned to one or both of the spouses.  In re
S.A.A., 279 S.W.3d 853, 857 (Tex. App.—Dallas 2009, no pet.).

Michael introduced the parties’ joint federal income tax
returns for the periods relevant to the employment tax obligation.  These showed that the business operated at a
loss for some of the years in question. 
Tracy testified, however, that Michael regularly took money from the
business that was never reported and that the tax returns did not accurately
reflect the income of the business.  She
also testified that, if she needed cash, she would call Michael to get permission
to take cash from the company account. 
Additionally, the record reflected that, during the relevant period,
Tracy regularly wrote checks from the company’s checking account for matters
not related to the business.  Therefore,
the trial court could reasonably have determined from the evidence that income
from Michael’s sole proprietorship during the marriage was property of the
community estate, that that income was increased and the community estate was
benefitted by Prescom Equipment’s failure to pay its federal employment taxes,
and that the loan taken out by Michael to pay off Prescom Equipment’s
employment tax burden could, therefore, properly be apportioned to the parties
jointly.  See Alsenz, 101 S.W.3d at 654; McElwee,
911 S.W.2d at 188–89.

We hold that the trial court did not abuse its discretion
by considering the tax obligation of Prescom Equipment when determining a just
and right division of the community estate.

C.              
Unequal division of the property

Tracy argues that the community property was divided
giving Michael 65% of the community property and Tracy 35%.  Tracy argues that this is not a just and
right division of the community estate.

In making this argument, Tracy makes general statements
like “the actual value of the community estate was approximately $108,000”;
“the only asset of significant value was the property in Crockett”; and the
remainder of the assets were “of nominal value, with the exception of some
vehicles and trailers specifically valued in the findings of fact.”  Tracy does not support these statements with citations
to the record.

Furthermore, the value of the community estate or the
value of the portions divided between the spouses is not readily discernable
from the record.  The findings of fact
and conclusions of law include a list of what the trial court considered to be
the assets and liabilities of the community estate along with the value that
the trial court assigned to them.  The
divorce decree, however, orders the parties to keep what is in their possession
except for certain enumerated items. 
Tracy does not provide citations to the portions of the record that
would allow us to determine which items were in each of the spouses’ possession
in order to determine which assets were specifically awarded to the
spouses.  Without this information, we
cannot determine what percentages of the community assets were awarded to each
spouse.  Because Tracy does not establish
from the record the value of the community estate or the proportion of the
estate that was awarded to her, we hold that this issue has been waived.  See
Tex. R. App. P. 38.1(i).

D.              
Reimbursement of the community estate

Finally, Tracy argues that the trial court erred by
ordering Michael to pay an inadequate amount to reimburse the community estate
for improvements made to Michael’s separate property residence.

The trial court ordered Michael to pay $35,000 to Tracy as
a part of the divorce.  This amount
constituted Tracy’s portion of the reimbursement owed to the community estate
for the improvements to Michael’s separate property as well as money owed to
create a just and right division of the marital estate.  The trial court did not otherwise designate
what amount of the $35,000 was for reimbursement or what amount was for
creating a just and right division.

Tracy argues that the record establishes that $120,839.00
in community funds were spent on improving Michael’s separate property and,
therefore, ordering Michael to pay $35,000 to Tracy—an amount that was not
solely for compensation for the community funds spent—was necessarily
inadequate.  There was much dispute
between the parties at trial over how much money was spent to improve Michael’s
separate property.  As we have said, the
trial court did not specifically state what it determined to be the amount owed
to the community estate for these improvements. 


Even if we assume that the trial court agreed with Tracy
about the amount owed for reimbursement, we find no error.  Under her scenario, Tracy’s half of the funds
owed to the community would be $60,419.50. 
In addition, her half of the liabilities owed by both parties is
$32,500.12.  The trial court only ordered
Tracy to pay $350 of her half of the liabilities, however.  Michael was ordered to pay the rest.  Because Michael has to pay $32,150.12 of
Tracy’s half of the obligations, this offsets the $60,419.50 that Tracy alleges
he owes to her.  Accordingly, Michael
would only be ordered to pay Tracy $28,269.38 for her portion of the reimbursement
owed to the community.  This would leave
$6,730.62 for the amount required to create a just and right division of the
community estate, an amount that we have no reason to question.  Accordingly, even if the trial court agreed
with Tracy as to the amount owed for reimbursement to the community estate,
Tracy was adequately compensated for her portion of the reimbursement owed to
the community estate.

We overrule Tracy’s fifth point of error.

                                                                                                                                   
Characterization of Horses

In her sixth point of error, Tracy argues that there was
no evidence to support the trial court’s finding that four horses were
Michael’s separate property.

A.              
Standard of Review & Applicable Law

Separate property consists, in part, of property acquired
by the spouse during marriage by gift.  Tex. Const. art. XVI, § 15; Tex. Fam. Code Ann. § 3.001(2)
(Vernon 2006).  “Community property
consists of the property, other than separate property, acquired by either
spouse during marriage.”  Tex. Fam. Code Ann. § 3.002
(Vernon 2006).  “Property possessed by
either spouse during or on dissolution of marriage is presumed to be community
property.”  Id. § 3.003(a) (Vernon 2006). 


To defeat the community property presumption, a spouse
must establish by clear and convincing evidence that property is separate
property.  Id. § 3.003(b).  Clear and
convincing evidence is defined as “the measure or degree of proof that will
produce in the mind of the trier of fact a firm belief or conviction as to the
truth of the allegations sought to be established.”  Id.
§ 101.007 (Vernon 2008).  “The
presumption, which is not evidence, ceases to exist upon introduction of
positive evidence to the contrary and is not then to be weighed or treated as
evidence.”  Harris v. Harris, 765 S.W.2d 798, 802 (Tex. App.—Houston [14th
Dist.] 1988, writ denied).

When conducting a legal-sufficiency review under the
heightened burden of proof for establishing separate property, we must “look at
all the evidence in the light most favorable to the finding to determine
whether a reasonable trier of fact could have formed a firm belief or conviction
that its finding was true.”  In re J.F.C., 96 S.W.3d 256, 266 (Tex.
2002); see also Stavinoha v. Stavinoha,
126 S.W.3d 604, 608 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (applying
standard to determination of separate property).  We must “assume that the factfinder resolved disputed
facts in favor of its finding if a reasonable factfinder could do so,” and “disregard
all evidence that a reasonable factfinder could have disbelieved or found to
have been incredible.”  J.F.C., 96 S.W.3d at 266.

B.              
Characterization of Horses

Tracy challenges the trial court’s finding that four
horses—Pepper, Lady, and two bay mares that do not have names—were Michael’s
separate property.  All relevant
testimony established that Pepper and the two bay mares were gifts.  The dispute concerns whether they were gifts
to Michael or gifts to the family. 
Additionally, all relevant testimony established that Lady was purchased
from funds obtained from either a settlement or insurance proceeds stemming
from injuries sustained by Pepper.

Tracy argues that a claim for separate property must be
supported with documentary evidence and that mere testimony will not overcome
the community presumption.  She cites In re Santopadre, No. 05-07-00027-CV,
2008 WL 3844517 (Tex. App.—Dallas Aug. 19, 2008, no pet.) (mem. op.) as
authority.  In Santopadre, the court held, “A party claiming separate property
must support the claim with documentary evidence; mere testimony that property
is separate is generally insufficient to overcome the community presumption.”  Id.
at *2.  Santopadre cites Boyd as
authority for its holding.  Id. (citing Boyd v. Boyd, 131 S.W.3d 605, 612 (Tex. App.—Fort Worth 2004, no
pet.)).  Boyd, however, dealt with purchases, not gifts: “as a general rule,
mere testimony that property was
purchased with separate funds, without any tracing of the funds, is
insufficient to rebut the community presumption.”  131 S.W.3d at 612 (emphasis added).  

It is well established that, in order to show that
property purchased during the marriage is separate property, it is not enough
to simply state that the funds used to purchase the property were separate
property funds; instead there typically
must be some sort of documentary tracing to show that the funds used were
separate property.  See, e.g., id.; Zagorski v.
Zagorski, 116 S.W.3d 309, 316 (Tex. App.—Houston [14th Dist.] 2003, pet.
denied).  The Dallas Court of Appeals has
acknowledged in a published opinion that testimony on characterization of
property can be sufficient when it is not contradicted and is supported by
other evidence or testimony.  Pace v. Pace, 160 S.W.3d 706, 714 (Tex.
App.—Dallas 2005, pet. denied).[3]

These rules do not apply to the three of the four horses
that were given as a gift: Pepper and the two bay mares.  It is undisputed that these three horses were
gifts.  Property that is given as a gift,
regardless of whether it is given to one person or to multiple people, is
separate property.  Tex. Const. art. XVI, § 15; Tex. Fam. Code Ann. § 3.001(2); see also Roosth v. Roosth, 889 S.W.2d
445, 457 (Tex. App.—Houston [14th Dist.] 1994, writ denied) (holding attempted
gift by third party to community estate vests each spouse with one-half
undivided interest in property as his or her separate property).  

Pepper was one of the horses given as a gift.  Michael testified that Pepper was a gift to
him from a friend named Gail Ray.  Tracy
testified that Pepper was a gift to the family. 
Gail Ray, however, testified that she gave Pepper to Michael
specifically.

One controlling factor in determining the character of
property given as a gift “is the donative intent of the grantor at the time of
the conveyance.”  Rusk v. Rusk, 5 S.W.3d 299, 303 (Tex. App.—Houston [14th Dist.]
1999, pet. denied).  We hold that Gail
Ray’s testimony on her donative intent was legally sufficient to establish that
Pepper was Michael’s separate property.

For the two bay mares, Michael testified that they were
gifts from his uncle to him.  Tracy
testified that the bay mares were given to the entire family.  No other evidence or testimony was given
concerning to whom the gifts were intended to be given.  The trier of fact is the sole judge of the
credibility of the witnesses and the weight to give their testimony.  Wilson,
168 S.W.3d at 819.  When there is
conflicting evidence, it is the province of the trier of fact to resolve such
conflicts.  Id. at 820.  Nothing in the
record establishes that it was error for the trial court to resolve this
conflicting evidence in favor of Michael.

Lady was the only horse of the four that was purchased
during the marriage.  Both Tracy and
Michael agreed that funds were received as a result of injuries sustained by
Pepper following an explosion on adjacent property.  Tracy testified that the funds were part of a
pre-lawsuit settlement by the owners of the adjacent property.  Michael testified that the funds were part of
insurance proceeds.

“Insurance proceeds paid or payable that arise from a
casualty loss to property during marriage are characterized in the same manner
as the property to which the claim is attributable.”  Tex.
Fam. Code Ann. § 3.008 (Vernon 2006).  We have already determined that Pepper is
Michael’s separate property. 
Accordingly, any insurance proceeds arising from casualty loss to Pepper
is also separate property.  We hold that
the result should be the same for settlement proceeds.  Settlement proceeds paid or payable that
arise from a casualty loss to property during marriage are characterized in the
same manner as the property to which the claim is attributable.  Because the result would be the same, we do
not need to evaluate the discrepancy between Tracy and Michael’s testimony
concerning whether the funds were obtained from a settlement or from insurance
proceeds.

The parties agreed that the proceeds obtained from the
casualty loss to Pepper were used to purchase Lady.  Because the parties agreed that these
proceeds were used to purchase Lady, there was no need at trial to trace the
proceeds.  See Pace, 160 S.W.3d at 714. 
Accordingly, we hold that the evidence is legally sufficient to
establish that the trial court could have formed a firm belief or conviction
that Lady was Michael’s separate property. 
See J.F.C., 96 S.W.3d at 266.

We hold that the evidence was legally sufficient to
establish that Pepper, Lady, and the two bay mares were Michael’s separate
property.  We overrule Tracy’s sixth
point of error.

                                                                                                                                                                   
Conclusion

We affirm the judgment of the trial court.

 

                                                                   Laura
C. Higley

                                                                   Justice


 

Panel consists of
Justices Keyes, Higley, and Bland.











[1]           Because the money constituting the
difference between the $47,000 loan and the full amount paid to the IRS was not
accounted for in the divorce judgment and this has not been raised by the
parties, we do not make it part of our analysis.





[2]           While there may be a strong
correlation between joint liability of the spouses and debts that can be
considered in the division of the community estate, this does not mean that
proof of one can stand in as proof for the other.





[3]           It is evident that, even though it was
issued more recently, Santopadre was
not meant to overrule Pace.  Santopadre
was a memorandum opinion.  In re Santopadre, No. 05-07-00027-CV,
2008 WL 3844517 (Tex. App.—Dallas Aug. 19, 2008, no pet.) (mem. op.).  Memorandum opinions discuss only issues that
are settled and cannot alter or modify existing rules.  Tex.
R. App. P. 47.4.